ATTORNEYS FOR APPELLANT
Susan K. Carpenter
Public Defender of Indiana

Thomas C. Hinesley
Joanna Green
Deputy Public Defenders
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Kelly A. Miklos
Deputy Attorney General
Indianapolis, Indiana



# In the
# Indiana Supreme Court

No. 48S00-0709-PD-362

FREDRICK MICHAEL BAER,

*Appellant (Petitioner below),*

v.

STATE OF INDIANA,

*Appellee (Respondent below).*

Appeal from the Madison Superior Court, No. 48D01-0805-PC-126
The Honorable Thomas Newman Jr., Special Judge

On Appeal from the Denial of Petition for Post-Conviction Relief

**January 26, 2011**

**Shepard, Chief Justice.**

A jury found Fredrick Michael Baer guilty of two counts of murder and sentenced him to death. In doing so, it rejected his request for a verdict of guilty but mentally ill. We affirmed on direct appeal. Baer then sought post-conviction relief, which the trial court denied. On appeal from that denial he argues ineffective assistance of trial and appellate counsel, that his death sentence violates the Eighth Amendment of the U.S. Constitution, and that the trial judge erred in rejecting his guilty but mentally ill plea. We affirm the post-conviction court.

**Facts and Procedural History**

Fredrick Michael Baer saw Cory Clark outside her duplex as he passed in his car, turned around, and went back to her home. He entered Clark's apartment after asking to use the phone to call his boss. He intended to rape Cory Clark, but after exposing her vagina decided against it for fear of contracting a disease. Realizing she could identify him, he cut her throat with a foldable hunting knife. Upon seeing what Baer was doing, four-year-old Jenna Clark ran from the room, but Baer caught her and cut her throat to avoid her identifying him. (PCR Ex. E at 2.)

Baer was charged with two counts of murder and various other offenses. The court entered pleas of not guilty on all counts. Baer subsequently moved to withdraw his not-guilty pleas and instead to plead guilty but mentally ill (GBMI). The prosecution objected. The court appointed two mental health experts to examine Baer. After considering their reports, the court rejected Baer's proposed GBMI plea, reasoning that although both experts concluded Baer was mentally ill, neither report sufficiently stated he was mentally ill at the time of the crime. (Trial Tr. at 172–73, 223.)

Both the prosecution and the defense made clear their intended strategies during jury selection. The defense previewed its case as one in which it would only argue for the jury to find Baer mentally ill, not that he had not committed the crimes. (Trial Tr. at 369–70.) In response to the prosecutor's concerns raised in a bench conference, Baer's counsel also stated that the appellate consequences of a GBMI verdict coupled with a death sentence were unclear. (Trial Tr. at 435.) This was the first time either side raised this issue. Baer v State, 866 N.E.2d 752, 760 (Ind. 2007).

Throughout jury selection, the prosecutor referred to these appellate uncertainties, saying for example, "The law is not clear in this state on whether we can execute somebody who's guilty but mentally ill. The jury makes a finding of guilty but mentally ill. It may happen. It may not. Our Supreme Court has not decided that case yet." (Trial Tr. at 649.) He frequently stated or implied that finding Baer guilty but mentally ill would mean concluding that he did not know the wrongfulness of his actions, which is not an element of GBMI but is required for

insanity. (Trial Tr. at 386, 494–95, 924–26, 937, 941–43.) The prosecutor also told the jury that the legislature might someday make parole available to defendants sentenced to life without parole, though he made clear that this was not presently the case. (Trial Tr. at 920–21.) Finally, in qualifying jurors for a death penalty trial, he inquired about the ability to sentence Baer to death very directly, asking one juror, "Do you have the strength to tell that man, that defendant, the guy with the striped shirt on . . . you killed these two people and you should forfeit your life for that. Something you could do?" (Trial Tr. at 568.)

During trial, Baer's defense focused almost entirely on convincing the jury he suffered mental illness at the time of the crime. All the expert witnesses who testified, whether called by the defense or the court, concluded that Baer suffered from mental illness. (Trial Tr. at 1779, 1902, 1909, 1929–30; PCR App. at 345.) In closing argument, the prosecution compared mental illness to self-defense as an "excuse" to evade responsibility for Baer's actions and continuing to mention wrongfulness as something which the jury should consider. (Trial Tr. at 2055, 2113–14.)

The jury found Baer guilty on all counts and rejected his GBMI request. During the penalty phase, it considered the aggravating and mitigating circumstances and recommended a death sentence, finding that the State had proven all five charged aggravators and that they outweighed the mitigating circumstances. (PCR App. at 328.) The court sentenced Baer to death for the two murders.

Baer's appeal asserted (1) prosecutorial misconduct; (2) erroneous admission of recorded telephone calls from jail; (3) trial court failure to comply with proper procedures in handling prospective jurors; and (4) inappropriateness of the death sentence. Baer, 866 N.E.2d at 755. Baer's prosecutorial misconduct claims focused on the prosecutor's attempt "to condition the jury to consider the effect that guilty but mentally ill verdicts might eventually have on the execution of a death sentence." Id. at 755–56. Extensively quoting the record, we concluded that because the defense first raised any appellate uncertainty the prosecutor did not act improperly in his "responding and presenting argument in order to resist the defense's strategy of gaining appellate advantage" Id. at 761.

3

Baer's subsequent challenge in post-conviction totaled 103 allegations. (PCR App. at 329–39, 521–23.) In short, these covered the following areas: prosecutorial misconduct, structural errors in the trial judge's rejection of Baer's GBMI plea and failure to correct the alleged prosecutorial errors, ineffective assistance of appellate counsel, ineffective assistance of trial counsel, cruel and unusual punishment based on Indiana's method of execution, and a challenge to Baer's death sentence based on being mentally ill. (PCR App. at 329–39.)

Baer presented the PCR court with additional expert and lay testimony about his mental illness. This included a youth counselor who worked with him at a school for juveniles with criminal histories, an ex-wife who had known him most of his life, and a fellow prisoner, all of whom testified about his mental illness, notably his auditory hallucinations. (PCR Tr. at 86–89, 136, 154, 182, 187.) None of these witnesses had testified at trial. The PCR court did not consider the prisoner's testimony because rather than "previously undiscovered evidence" under Ind. Code § 35-50-2-9(k) (2008), he was simply a witness about whom Baer did not tell defense counsel. (PCR App. at 349–50.) The PCR court determined that the other witnesses largely duplicated the evidence presented at trial, thus failing to undermine confidence in the jury's rejection of the GBMI verdict. (PCR App. at 345.)

In rejecting Baer's prosecutorial misconduct, structural error, and method of execution claims, the PCR court found these arguments foreclosed because he had not raised them at trial or on direct appeal. (PCR App. at 340, 348.) As for Baer's claim of ineffective assistance of trial and appellate counsel, the PCR court reasoned that the PCR evidence about mental illness failed to undermine confidence in the verdict or Baer's sentence. (PCR App. at 341–48.)

The PCR court rejected Baer's constitutional challenge to the death penalty as applied to mentally ill defendants, saying it was "procedurally defaulted" in light of the fact that the U.S. Supreme Court's precedent has not changed since Baer's 2005 trial and Baer had made this argument first on PCR. (PCR App. at 351–52.) Baer argued that Kennedy v. Louisiana, 554 U.S. 407 (2008), opened the door to such a challenge, but the court rejected this argument

4

because <u>Kennedy</u> involved the Court's rejection of the death penalty for a class of <u>crimes</u>, not a class of criminals as in prior relevant cases. (PCR App. at 351–52.)

Because this is an appeal from post-conviction determination on a sentence of death, we have exclusive jurisdiction. Ind. Post-Conviction Rule 1(7). In post-conviction proceedings, we will reverse a trial court's findings and judgment only upon a showing of clear error in a factual determination or error of law. <u>Helton v. State</u>, 907 N.E.2d 1020 (Ind. 2009).

## I.      Guilty But Mentally Ill

Baer's various GBMI strategies sought an alternative verdict available when a defendant suffers from mental illness or deficiency but nonetheless remains capable of discerning right from wrong. Ind. Code § 35-36-2-3 (2008). "Mentally ill" for these purposes means "having a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function; 'mentally ill' also includes having any mental retardation." Ind. Code § 35-36-1-1 (2008).

The difference between guilty and guilty but mentally ill does not compel a difference in sentencing. Ind. Code § 35-36-2-5(a) (2008 & Supp. 2010). When a court enters a verdict of GBMI, the defendant must be psychiatrically evaluated before sentencing. Ind. Code § 35-36-2-5(b). Then, when the Department of Correction receives the defendant as a prisoner, he is further evaluated and treated in a manner as indicated by the mental illness. Ind. Code § 35-36-2-5(c). This treatment may be done by the Department of Correction or the Division of Mental Health and Addiction, either during imprisonment or during defendant's probation. Ind. Code § 35-36-2-5(c) & (d).[1]

---

[1] If a mentally ill prisoner is diagnosed while incarcerated rather than on a GBMI verdict, the Department of Correction must provide for the prisoner's care. Ind. Code § 11-10-4-2 (2008). Baer had received "very substantial antipsychotic treatment since he's been incarcerated" aimed at his schizophrenia symptoms. (PCR App. at 278.) "In fact, almost as soon as he was incarcerated, they started treating him with antipsychotic medications." (PCR App. at 290.)

Baer never argued that he was insane or that he was otherwise not guilty. (Appellant's Br. at 14.) Judge Spencer having declined to accept Baer's pretrial plea of guilty but mentally ill, Baer's lawyers emphasized to the jury that he was mentally ill. The guilt phase of Baer's trial thus determined only which of the two possible versions of guilty verdicts should be entered.

The trial court's decision to decline Baer's plea of GBMI was available as an issue for direct appeal. It is therefore barred as a freestanding claim in post-conviction. Whether it reflects on the effectiveness of his lawyers we address below.

## II. Baer's Trial Counsel Did Not Perform Ineffectively.

To establish a violation of the Sixth Amendment right to effective assistance of counsel, the defendant must show that (1) counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687 (1984). When analyzing such claims, we begin with the presumption that counsel was effective. Autrey v. State, 700 N.E.2d 1140 (Ind. 1998).

Although the performance prong and the prejudice prong are separate inquiries, failure to satisfy either prong will cause the claim to fail. French v. State, 778 N.E.2d 816 (Ind. 2002). If we can easily dismiss an ineffective assistance claim based upon the prejudice prong, we may do so without addressing whether counsel's performance was deficient. Wentz v. State, 766 N.E.2d 351 (Ind. 2002).

As with other aspects of Baer's petition for post-conviction relief, the performance of his lawyers is implicated in a good many of the 103 identifiable contentions. We have considered all of these, but discuss only those that seem the weightiest.

## A. Timely and Comprehensive Mental Health Evaluations

Baer asserts that his "trial counsel failed to obtain timely and comprehensive evaluations in a case where mental health was the pivotal issue." (Appellant's Br. at 44.) Baer's theory is that he suffers from "cognitive impairments, substance-induced psychotic disorder, and schizotypal, paranoid, and borderline personality disorders . . . which substantially impaired his ability to conform his conduct to the law at the time of the crime and are extreme mental disturbances[,]" and the jury was unaware that Baer had brain damage and the "biopsychosocial causes of his many personality disorders." (Appellant's Br. at 44.) Counsel asserts that there is a "reasonable likelihood that, had the jury heard the evidence, it would have found Baer GBMI or, at a minimum, voted against death." (Appellant's Br. at 47.)

The State, by contrast, points to trial counsel's substantial work investigating, preparing, and presenting evidence of Baer's background and mental health. (Appellee's Br. at 51–53.) It says Baer's post-conviction evidence is substantially cumulative of the testimony and opinion presented at trial, his experts were qualified and judiciously chosen, and that these experts used appropriate and reliable methodology. (Appellee's Br. at 51–53.)

Trial counsel hired Dr. George Parker to render a psychiatric evaluation to determine whether Baer had any existing symptoms of mental illness and ascertain what treatment was needed. (Trial Tr. at 1774–75.) Dr. Parker found that Baer "had a history of some significant drug issues[,]" including methamphetamine, cocaine, inhalant dependence, and marijuana abuse. (Trial Tr. at 1778.) These issues began in his adolescent years and continued into his adult years. (Trial Tr. at 1778.) Dr. Parker noted that Baer's substance abuse "may well have caused significant changes to [his] brain." (Direct Appeal App. at 1551.)

At trial, Dr. Mark Cunningham discussed some of Baer's family background and certain risk factors. He discussed Baer's prenatal and perinatal difficulties including his mother having cancer while pregnant, drinking while pregnant, and Baer being malnourished during the first three to six months of his life. (Trial Tr. at 2277, 2305–06, 2308–11.) Dr. Cunningham detailed alcohol abuse in Baer's family history including by his parents during his childhood. He testified

7

extensively about Baer's family, including the number of men his mother bore children with, the multiple family members who were victims of domestic violence, and the many who had psychological disorders. (Trial Tr. at 2288–92, 2341–44, 2347–68.) Dr. Cunningham also testified at length about what he referred to as "toxic parenting." (Trial Tr. 2347–68.) He detailed Baer's poor school performance and struggles with ADHD as well as several head injuries suffered during his youth. (Trial Tr. at 2316–28.) Cunningham also extensively discussed Baer's abuse of inhalants, alcohol, methamphetamine, and other substances. (Trial Tr. at 2328–41, 2390–92.) Trial counsel did not directly ask whether Baer met Indiana's statutory definition of mental illness or the statutory mitigators related to his mental health, but Cunningham did say that Baer was "extraordinarily damaged." (Trial Tr. at 2410.)

At post-conviction, Dr. Philip Harvey, a neuropsychologist with a specialty in psychosis, performed a thorough neuropsychological examination on Baer and determined that there was no evidence Baer was malingering. (PCR Tr. at 275–76.) He diagnosed Baer with persisting dementia, most likely the result of his substance abuse, including methamphetamine and inhalants. (PCR Tr. at 274–78.) Dr. Harvey diagnosed Baer with substance-induced psychosis, a disorder not dependent on Baer taking drugs, but rather persisting long after the discontinuation of substance abuse. (PCR Tr. at 289.) Baer contends the "combination of these illnesses meant Baer was under an extreme mental or emotional disturbance at the time of the crime which affected his ability to conform his conduct." (Appellant's Br. at 45.)

Dr. George Savarese, a licensed clinical social worker, also testified at PCR. He explained that Baer's mental illnesses were the result of years of abuse, saying that Baer lacked a strong father-figure and experienced an unduly enmeshed relationship with his mother and a turbulent relationship between his parents—all which led to an emotional defense mechanism known as "splitting."[2] (PCR Tr. at 377, 387–88, 391, 436.) Dr. Savarese concluded that Baer was under extreme mental/emotional disturbance at the time of the crime, but could understand his conduct though "he could not control his behavior." (PCR Tr. at 444.)

---

[2] According to the testimony on post-conviction review, splitting is an emotional defense mechanism where people see things as completely black and white with no grey areas. (PCR Tr. at 391.)

8

Baer cites Prowell v. State, 741 N.E.2d 704, 714 (Ind. 2001), for the notion that "failure to retain an appropriate mental health expert in a timely manner and provide that expert with essential information is ineffective assistance of counsel." (Appellant's Br. at 44.) This is obviously correct, but unlike Prowell's lawyers, Baer's counsel did more than "rely on the good graces of the Circuit Court judge not to put [Baer] on death row." Prowell, 741 N.E.2d at 715. Baer's counsel enlisted their own experts who were able to help them establish a relationship and acquire useful information to convey at trial. Moreover, Dr. Parker and Dr. Cunningham were not badly chosen or lacking in qualification (indeed trial counsel testified at post-conviction that they had a strategy for their selection), and Baer has not cast any particular doubt about their methodology or demonstrated that the results of their examinations and assessments were unreliable. The PCR court was warranted in concluding that the evidence by additional experts was substantially cumulative of the testimony and opinion presented at trial. The expert testimony and quality of evidence does not appear to be more credible or more deserving of weight than the testimony offered on mental issues at trial.

We hold that trial counsel's performance was not deficient in this respect.

## B. Trial Counsel's Attempt to Plead GBMI

Baer contends that trial counsel's attempt to plead GBMI was ineffective because of counsel's failure to know the law and failure to present available evidence in support of the plea. (Appellant's Br. at 47–50.)

Baer says that his lawyers did not know the law relevant to GBMI and the death penalty. (Appellant's Br. at 48.) Specifically, he contends that counsel did not know the holding of Harris v. State, 499 N.E.2d 723 (Ind. 1986), or that there was a statute for GBMI. (Appellant's Br. at 48.) The State contends that "trial counsel held an accurate view and interpretation on the current state of the law regarding GBMI and the death penalty." (Appellee's Br. at 58.)

Trial counsel discussed both Harris and Prowell with the court during the two hearings on Baer's GBMI plea. (Trial Tr. at 183–84.) It seems that the current debate focuses on the parties'

contentions before (and during) trial about whether a GBMI defendant might be ineligible for the death penalty or avoid death because a formal finding of GBMI might be a winning mitigator in a penalty phase or on appeal. The latter was among the prosecutor's objections to a GBMI judgment either by plea or jury finding.

Baer has failed to show that trial counsel's knowledge of the law led to any confusion or mistaken understanding of a GBMI plea by the trial court. As for whether counsel were deficient in supplying enough mental health evidence to persuade the judge to accept his GBMI plea, it is plain that counsel believed there was adequate evidence to support such a finding, "an abundance of evidence that there was mental illness in Mr. Baer's past," as counsel testified during post-conviction proceedings. (PCR Tr. at 59–60.)

The heart of the current contention is that had counsel called live witnesses and used more of them, rather than submitting the experts' written reports, Judge Spencer would have permitted a plea of GBMI. The written reports reflect some disagreement among the experts about the impact of Baer's illness on him at the time of the crime. In light of that and given the strategic advantage both sides sought in gaining or preventing a GBMI finding, we think Judge Spencer was right to disallow the plea and that he would not have acted otherwise had trial counsel proceeded the way Baer says they should have.

### C. Failure to Seek a Continuance

Baer argues that trial counsel violated his Sixth Amendment rights by failing to ensure they had adequate time to prepare. (Appellant's Br. at 51.) His theory is that requesting more time may have avoided the problems that occurred in Dr. Davis' testimony, during which he could not locate a particular record during cross-examination and appeared disorganized. (Appellant's Br. at 52–53.)

Lead counsel Jeffrey Lockwood began representing Baer just four months before jury selection. (Direct Appeal App. at 1155.) Baer believes lead counsel should have requested a continuance because Lockwood did not have ample time to develop and litigate a respectable

trial strategy, pointing to the fact that former lead counsel Douglas Long was not certain he would be ready for the trial in April 2005 because Long felt as though he was working on the case alone. Baer contends that the mitigation specialist was overwhelmed with the records in the case and further explains that more time "may have avoided the problems during Dr. Davis's testimony where he could not locate a particular record during cross-examination and appeared disorganized." (Appellant's Br. at 53.)

Neither of Baer's trial lawyers believed they needed a continuance. (Appellant's Br. at 52.) Baer acknowledges that his second attorney Bryan Williams, who had been his counsel from the beginning, had extensive trial experience. (Appellant's Br. at 51.) Both lawyers, of course, met the requirements of Ind. Criminal Rule 24(B), and Lockwood had a great deal of experience in capital trials. (PCR Tr. at 20, 51–52.)

We are not convinced that some momentary fumbling to locate certain documents during cross-examination is sufficient to demonstrate deficient performance.

### D. Failure to Conduct Adequate Jury Selection

Baer asserts that several jurors susceptible to challenge for cause went unchallenged. In particular, he asserts that trial counsel failed to object to the prosecutor's misstatements and failed to educate the jury appropriately about relevant mitigation, the meaning of life without parole, and other issues. (Appellant's Br. at 53–57.)

For example, Baer says his counsel did not adequately explore jurors' ability to follow the law. (Appellant's Br. at 53.) Baer does not direct us to any particular place in the record where more questioning was required, and the record is full of defense counsel's thorough questioning on the potential jurors' ability to follow the law. (Trial Tr. at 430, 435–38, 441–43, 511–12, 515, 526–27, 593–94, 597–602, 787–90, 834–36, 840–42, 845, 965–69, 973–75, 977–80, 1025.)

11

Baer does argue that jurors Brown, Criss and Lewis were "automatic death penalty" jurors. (Appellant's Br. at 54.)

During voir dire, juror Brown indicated that he would consider mitigating circumstances. (Trial Tr. at 769.) When Lockwood asked, "I want to have a chance with you for a vote of life. Do I have that chance with you," Brown responded "[y]es." (Trial Tr. at 790.) Juror Criss generally disfavored the death penalty but felt that it could be appropriate in some cases. (Trial Tr. at 658–59.) Further questioning revealed that juror Criss would base her decision on all the evidence. (Trial Tr. at 659–60.) Juror Lewis stated that he would decide the case based on the evidence. (Trial Tr. at 386.) Not even the most tortured reading of the transcript suggests that juror Lewis was an automatic death penalty juror.

Baer also argues that jurors Criss, Hartman, Zurcher, and Huett were "resistant to mitigation" because they checked a box on their juror questionnaires that stated they "[d]isagree[d] strongly" with the statement: "A person's upbringing and background are relevant to the punishment he should receive if he is committing a crime."[3] (Appellant's Br. at 54.) Baer also argues that his trial counsel did not discuss mitigation at all during voir dire and that there should have been an extensive discussion.

Counsel's discussion with Criss, Hartman, Zurcher, and Huett refutes the notion that they were mitigation resistant. (Trial Tr. at 660, 752–57, 784, 786–90, 919–21, 938–40, 973, 978, 980–81.) The juror questionnaires present multiple messages about the jurors' feelings on mitigation. Jurors Hartman, Huett, and Zurcher all checked a box stating: "Both a person's background and the nature and details of a particular crime should be considered in deciding appropriate punishment." Jurors Huett, Criss, and Hartman all checked a box on their questionnaires stating: "I would seriously weigh and consider the aggravating and mitigating factors in order to determine the appropriate penalty in this case." Those statements suggest that these jurors were open to mitigation. The jurors' answers during voir dire do not demonstrate that counsel were deficient in not challenging them for cause.

---

[3] Our review of the record indicates that juror Hartmann checked the box "[d]isagree somewhat" rather than "[d]isagree strongly." (Court's Ex. 3.) (Exhibits Vol. VIII).

Baer asserts that his trial counsel had a complete "failure to discuss issues of mitigation with prospective jurors." (Appellant's Br. at 54.)  The record, however, shows just the opposite.  Baer's trial counsel believed that mental illness was the strongest mitigating factor in this case and, consequently, they discussed mental illness extensively during <u>voir</u> <u>dire</u>.  We conclude that trial counsel adequately conducted jury selection.

### E. Trial Counsel's Presentation of GBMI at Guilt Phase

Baer asserts "trial counsel were ineffective in their investigation and presentation of evidence to support a guilty but mentally ill verdict." (Appellant's Br. at 57.)  His contentions are counsel failed to present the jury with additional corroborating evidence about Baer's mental health, failed to withdraw the insanity defense, and failed to offer a <u>preliminary</u> instruction on GBMI that tracked the applicable statute.  (Appellant's Br. at 58.)

Baer says counsel should have discovered Zola Brown and William Ogden, both of whom could testify that that he heard voices during the years before the crime.  But all three mental health experts who testified at the guilt phase discussed Baer's auditory hallucinations and all three experts explicitly stated that Baer was mentally ill. (Trial Tr. at 1779–80, 1785–86, 1869–74, 1886–87, 1894, 1909, 1926, 1929–30, 1945, 1947–53, 1973–74, 1978–79, 1992–93.)  The lack of testimony by two lay witnesses who could corroborate the facts used by the experts does not establish ineffective performance.

As for failing to withdraw the insanity defense, the Indiana Code provides only two ways that a defendant can be found GBMI.  First, a defendant may seek to plead GBMI if that plea is voluntary and supported by an adequate factual basis.  Ind. Code §§ 35-35-1-2 & -3 (2008).  Second, a jury can return a GBMI verdict if the defendant interposes the insanity defense.  Ind. Code § 35-36-2-3(4) (2008).  The instant argument is that counsel should have tried to create a third way by asking to pursue GBMI without a plea of insanity in place.

Taking the road authorized by the Code conferred multiple advantages. Not the least of these was defense counsel's ability to play off against the prosecutor's contention that Baer was not taking responsibility. Trial counsel frequently told the jury that Baer was not insane and was not using the insanity defense. (Trial. Tr. at 423, 426, 590–91, 641–42, 706–08, 710, 721, 783, 844–45, 910–11, 965, 1023, 1031–33.)

As for whether a preliminary instruction on GBMI was required, failure to tender one was not ineffective assistance of counsel because there was a final instruction given on GBMI. Phillips v. State, 550 N.E.2d 1290, 1296 (Ind. 1990); Everly v. State, 271 Ind. 687, 691–92, 395 N.E.2d 254, 257 (1979).

The post-conviction court was right to deny Baer's claims on these points.

**F. Cross-Examination of Dr. Evans**

Dr. Evans is a toxicologist who testified about a sample of blood collected after Baer's arrest and tested by AIT Laboratories about thirteen months later. (Trial Tr. at 1616, 1621, 1623–47.) Twelve days before trial, the State disclosed the results. The test revealed some marijuana usage and "absolutely zero" for all other drug classes, including methamphetamine. (Trial Tr. at 1630–31, 1635.)

Dr. Evans testified that there was no methamphetamine, amphetamine (methamphetamine's break-down product), or any other drug of abuse in the blood sample taken from Baer. (Trial Tr. at 1635.) He said that drugs in the blood would have broken down some in the thirteen months between when the blood was drawn and the testing. (Trial Tr. at 1639.) During cross-examination, Dr. Evans said that if Baer used 250 milligrams or more of methamphetamine within thirty-six hours of the blood draw, methamphetamine or amphetamine would have shown up in the blood analysis. (Trial Tr. at 1642–44.) He said that he did not know when Baer had last used methamphetamine and that if Baer had a small dose on the day of the crime he would not have been able to detect any methamphetamine or amphetamine in the blood sample. (Trial Tr. at 1643.) He did say Baer could not have taken a gram or more the day

14

of the crime. The prosecution later used this testimony to argue that Baer was malingering about his drug abuse around the time the crime was committed. (Trial Tr. at 2070.)

At post-conviction, Dr. Evans testified that the best approach is to have blood collected at or near the time of an incident and test it as soon as possible because drugs are chemicals which break down and blood is not the most conducive environment for preserving chemicals. (PCR Tr. at 490.) Ultimately, Dr. Evans could not say whether methamphetamine existed in Baer's blood at the time it was collected, only that there was no such substance in his blood when it was tested. (PCR Tr. at 490.)

The upshot of all this is that Dr. Davis's testimony before the jury and his testimony at PCR were pretty consistent: if Baer had a very small amount of meth in his system on the day of the crime the tests might not have revealed it, but if he had an amount typical for users or abusers it would have. If anything, the extra effort by PCR counsel demonstrates that extra effort by trial counsel would have been fruitless.

### G. Using Projection of Gruesome Photos

Baer contends that trial counsel was deficient for failing to object to the projection of the crime scene photographs on a very large screen. (Appellant's Br. at 64–65.) Specifically, he argues that there could be "no strategic reason for failing to object to photographs the prosecutor himself described as 'horrifying'" and "[h]ad trial counsel objected to the manner in which the crime scene photographs were displayed the objection would have been sustained." (Appellant's Br. at 65.)

The photographs in question provided a sense of the location of the crime, and they corroborated the responding officer's testimony about the discovery of the victims' bodies, the testimony of other witnesses who described the crime scene, and the extent of the injuries. (See Trial Tr. at 1174–76.) Although the photographs are most unpleasant, they were admissible to give the jury an understanding of the crime scene and the nature of the crime. See Phillip v.

15

State, 550 N.E.2d 1290, 1299 (Ind. 1990).  The photos were also pertinent to the jury's task of assessing Baer's level of mental culpability.

The current contention is not about admissibility but about manner of display. Respectable counsel could take differing views about whether it was more prejudicial to the defense for jurors to see such photographs on a large screen or to linger over the images while holding them in their own hands.

### H. Did Trial Counsel Fail to Ensure Proper Instructions?

We will reverse a post-conviction court's decision regarding ineffective assistance for failure to object to instructions only if Baer can show that the trial court was compelled as a matter of law to sustain his objections.  Lambert v. State, 743 N.E.2d 719 (Ind. 2001).  Similarly, for claims that different instructions should have been tendered by trial counsel, we will not reverse if "the trial court could have properly refused the instruction under applicable law," meaning, that we will not reverse the post-conviction court unless the trial court would have been compelled by law to give the instruction. Id. at 738–39.

Indiana Code § 35-50-2-9(c)(6) allows the jury to consider in mitigation "[t]he defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication."  Jury instruction number eleven parroted this statute, but did not include the last three words. (Direct Appeal App. at 1324.)  Baer argues that instruction eleven should have ended with the words "of intoxication."  An instruction tendered by Baer with the intoxication language could have been rejected by the trial court because the evidence showed that Baer was not intoxicated at the time of the offense. (Trial Tr. at 1257–63, 1627–47, 2404–05.)

Another challenge relates to an instruction telling the jury that voluntary intoxication was not a defense and could not be taken into account when determining the mental state required for conviction. (Direct Appeal App. at 1333–34.)  Baer argues that this instruction prevented the

jury from considering intoxication as a mitigating factor.  (Appellant's Br. at 66–67.)  This instruction was a correct statement of the law and was relevant in determining whether Baer committed his crimes intentionally.  As to mitigation, the court told jurors they could consider "[a]ny . . . circumstances" (Direct Appeal App. at 1324) in mitigation and that "there are no limits on what factors an individual juror may find as mitigating." (Direct Appeal App. at 1325.) An objection to the instruction on voluntary intoxication as a defense to the crime would have been overruled at trial.

Baer also argues that counsel should have objected to an instruction that "the jury has the right to accept or reject any or all of the testimony of witnesses, whether expert or lay witnesses on the questions of insanity or mental illness."  (Direct Appeal App. at 1336.)  We think it unlikely that most counsel would have worried much about this mention of insanity. The court properly instructed the jury on issues of GBMI and insanity.  Baer's trial counsel told the jury repeatedly that they were not arguing that Baer was insane.  The jury would not have inferred that Baer was claiming he was legally insane.

Lastly, Baer claims that counsel was ineffective for not offering an instruction stating that life without parole means life without parole.  (Appellant's Br. at 68.)  The term "life without parole" consists of ordinary words that can easily be understood by the average person.  See Stevens v. State, 770 N.E.2d 739, 756 (Ind. 2002).

## I. Baer's Eligibility for the Death Penalty

Baer contends that had "trial counsel competently litigated Baer's ineligibility for the death sentence, there is a reasonable likelihood Baer would not have been sentenced to death" because he is mentally ill and therefore ineligible for the death penalty.  (Appellant's Br. at 69.) There is no state or federal constitutional bar to executing the mentally ill, Matheny v. State, 833 N.E.2d 454 (Ind. 2005), and counsel acted within the bounds of reasonable performance to recognize the law on this point.

## J. Investigating and Presenting Mitigating Evidence

Baer asserts that trial counsel's decision "not to present any witnesses other than Dr. Cunningham was not a decision based on a reasonable investigation" and therefore is not entitled to deference because a reasonable investigation would have helped uncover mitigating evidence. (Appellant's Br. at 70.)

Trial counsel Bryan Williams explained the defense team's decision:

> We had Dr. Cunningham who had spent a substantial amount of time putting together the entire family history, how certain folks were related, incidents, and we thought at the time that he was probably in as good a position as anybody to explain the entire family history, and we thought he was a very good witness so we decided to use him exclusively.

(PCR Tr. at 33.) Lead trial counsel Jeffrey Lockwood confirmed this assessment when he testified at the post-conviction hearing:

> I did not feel that we could rely on any of the family members under all circumstances to be helpful to us. And beyond that, there weren't many other people. And so what we did was we tried to incorporate in Dr. Cunningham's examination all of the things that he uncovered about social history. I mean we did think about [calling other witnesses], but we had ample reason in my opinion to believe that we would not gain ground by calling family members.

(PCR Tr. at 73–74.) Our review of the PCR transcripts leads us to the conclusion that there were reasons that an experienced attorney might hesitate to call Baer's family members; it was professionally reasonable not to call additional witnesses.

This case is hardly a case where no mitigating evidence was assembled. Trial counsel hired a mitigation consultant, and because of her efforts, counsel knew a great deal about the defendant's background, upbringing, and prior mental health problems. (PCR Tr. at 26, 56–57,

18

61–62, 71.) Dr. Cunningham conducted interviews with many of Baer's family members and reviewed Baer's records (including school and mental health records) and notes from interviews with many people from Baer's past. (Trial. Tr. at 2253–54, 2264–65.) He testified about many potential mitigators including previous mental health disorders, diagnoses, and institutionalizations (Trial Tr. at 2266, 2311, 2313–24, 2374–82, 2387, 2400–03), Baer's extremely troubled family situation (Trial Tr. at 2284, 2288–93, 2337–45, 2347–72, 2409–2410), Baer's extensive history of substance abuse (Trial Tr. at 2284, 2328–32, 2390–93, 2403–05), and Baer's history of neurological problems (Trial Tr. at 2306–11, 2325–28, 2332–36). We find that Dr. Cunningham's testimony presented an abundance of potential mitigating factors to the jury.

As in Woods v. State, 701 N.E.2d 1226 (1998), Baer's argument is essentially that counsel should have done more. In all post-conviction proceedings, the petitioner will always be able to find some information from his past that was not presented to the jury. Dr. Cunningham's testimony included almost all of the potential mitigators that Baer asserts should have been better presented to the jury. We do not believe the result of Baer's trial would have been different had the witnesses who testified at the PCR hearing been called at trial.

### III.  Baer's Appellate Counsel Was Not Ineffective.

Ineffective assistance of appellate counsel claims generally fall into three basic categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. Henley v. State, 881 N.E.2d 639, 644 (Ind. 2008) (citing Reed v. State, 856 N.E.2d 1189, 1195 (Ind. 2006)). Baer's arguments on these points fall into seven categories.

### A.  Prosecutorial Misconduct

Baer first argues that appellate counsel Mark Maynard was ineffective because he inadequately presented a claim of prosecutorial misconduct. (Appellant's Br. at 33.)

19

Maynard testified that he intended to present the full range of prosecutorial misconduct claims on appeal. (PCR Tr. at 515.) He did not categorize the types of comments the prosecutor made, listing them instead in chronological order because he felt "they were pretty patent on their face as to what sort of misconduct each comment was." (PCR Tr. at 514–15.) On appeal, however, we found that Maynard raised only the prosecutor's statements to the jury that finding Baer GBMI would reduce the chances of him receiving the death penalty. Baer, 866 N.E.2d at 755.[4]

There are other contentions about Maynard's presentation of prosecutorial misconduct that we now examine, the question being whether it was so badly done as to violate the Sixth Amendment.

Maynard correctly realized that because trial counsel failed to object to "virtually all" instances of alleged prosecutorial misconduct, an appellate court would review them only for fundamental error. (PCR Tr. at 514); see also Ortiz v. State, 766 N.E.2d 370, 375 (Ind. 2002). It is highly unlikely that Baer would have prevailed on any fundamental error claims as respects prosecutorial misconduct on direct appeal. Benson v. State, 762 N.E.2d 748, 755 (Ind. 2002) (fundamental error is recognized only when record reveals clearly blatant violation of basic and elementary principles, where the harm or potential for harm cannot be denied, and which violation is so prejudicial to the rights of the defendant as to make fair trial impossible).

Getting to specific instances, during voir dire the prosecutor did often conflate the separate concepts of GBMI and insanity by referring to whether Baer could appreciate the wrongfulness of his actions. (first panel—Trial Tr. at 236–37, 386–92, 396–98, 407; second panel—Trial Tr. at 464, 469–70, 484, 494; third panel—Trial Tr. at 536.) The ability to appreciate the wrongfulness of one's actions is relevant to an insanity defense but not to a GBMI

---

[4] Baer presents his freestanding claim for prosecutorial misconduct as the lead argument in his brief. (Appellant's Br. at 8.) Maynard clearly raised the issue of prosecutorial misconduct by arguing that the prosecutor's statements on GBMI were inappropriate; it is res judicata by virtue of our opinion in Baer, 866 N.E.2d at 761. We examine it here as it may reflect on his claim about the performance of appellate counsel. Timberlake v. State, 753 N.E.2d 591, at 597–98 (Ind. 2001); see also Harris v. State, 861 N.E.2d 1182, 1186 (Ind. 2007).

verdict, which requires instead that a psychiatric disorder substantially disturb a person's thinking, feeling, or behavior and impair his ability to function.  Compare Ind. Code § 35-36-1-1 with Ind. Code § 35-41-3-6(a).

It seems likely that defense counsel consciously chose not to object to the prosecutor's misstatements as part of their general strategy of letting the prosecutor discredit himself.  (PCR Tr. at 32.)  At PCR, Williams testified that he had known Prosecutor Cummings for years and knew he was capable of overstating his case to the jury.  (PCR Tr. at 32.)  Trial counsel planned to correctly state the law to the jury when it was their turn, have the judge echo their statement of the law through the jury instructions, and hope the jury would decide from the contrast that the prosecutor was not credible.  (PCR Tr. at 32.)

Consistent with this approach, defense counsel correctly stated the law in closing argument:

> Let me repeat this for the hundredth time: We are not saying that
> Fredrick Michael Baer is insane.  I said it to you in jury selection.
> Mr. Lockwood said it to you.  I've said it to you repeatedly. . . .
> Mental disease or defect.

(Trial Tr. at 2105.)  And the court's instructions correctly stated the law and made it clear that they took precedence over arguments by counsel on what the law was.  (Trial Tr. at 1126, 1130–31, 2122, 2580.)  It was not deficient for Maynard to take a pass on this potential claim.

The prosecutor also spoke equivocally about whether the State could execute a defendant found GBMI, telling the jury, "The law is not clear in this state on whether we can execute somebody who's guilty but mentally ill.  Our Supreme Court has not decided that case yet." (Trial Tr. at 649.)  He made this statement even though we upheld a death sentence of a defendant found GBMI in Harris v. State, 499 N.E.2d 723, 725–27 (Ind. 1986) (analyzing only Eighth Amendment and Indiana statutory claims).

Baer's appellate ineffective assistance of counsel claim has much in common with his direct appeal claim about the prosecutor's statements and allegations about trial counsel on the

21

same point. Prosecutors and defense counsel alike would have read our opinion in Prowell v. State, 741 N.E.2d 704, 717 (Ind. 2001), in which we observed that defendants formally found GBMI "normally receive a term of years or life imprisonment." We observed that many shared the view that death was inappropriate for a GBMI defendant. Id. at 718. We set aside Prowell's sentence partly on this basis.

These judicial declarations explained why Baer's lawyers, from trial through PCR, have labored to obtain a GBMI conviction, and why the prosecutors have pushed back at each turn. It adequately explains why Maynard did no damage in not complaining about the prosecutor's statement to the jury.[5]

On another front, the prosecutor also discussed during voir dire the possibility that the legislature might one day change the law on life without parole and allow Baer to receive parole. (Trial Tr. at 920–21.) The prosecutor nevertheless correctly stated the current law on life without parole, as did trial counsel. (Trial Tr. at 428, 601, 920.) We rejected this claim on direct appeal because defense counsel initiated the discussion, so it was not improper for the prosecutor to respond. Baer, 866 N.E.2d at 760–61.

Baer also argues that the State falsely claimed that Baer refused to accept responsibility because Baer attempted to plead GBMI. (Appellant's Br. at 20.) Baer says that his attempted GBMI plea should have been "considered a significant mitigating circumstance" and that the State "essentially turned a potentially mitigating factor into a nonstatutory aggravating factor." (Appellant's Br. at 21–22.)

This statement did not deprive Baer of a fair trial. Baer's counsel repeatedly told the jury that Baer committed these crimes and was not disputing his innocence. The jury knew that Baer

---

[5] About the time of Baer's trial, we held that the Indiana Constitution did not forbid death sentences for defendants who were mentally ill when they committed the murders. Matheney v. State, 833 N.E.2d 454, 457 (Ind. 2005); Baird v. State, 831 N.E.2d 109, 111 (Ind. 2005). Both these decisions noted that the juries in the respective cases did not find the defendants GBMI. In a dissent to an earlier decision, Justice Rucker took the position that executing a person suffering a severe mental illness would violate the Cruel and Unusual Punishment Clause of art. I, § 16, of the Indiana Constitution. Corcoran v. State, 774 N.E.2d 495, 503 (Ind. 2002) (Rucker, J., dissenting).

was not attempting to say that he was innocent. The prosecutor was seeking a guilty verdict and saw Baer's attempt to plead GBMI as an attempt to avoid full responsibility for his crimes. Baer's counsel acknowledged that Baer wanted a GBMI verdict because they thought it was Baer's best chance at avoiding the death penalty. This was part of the rhetorical struggle sensibly waged by both sides.

Baer says his appellate lawyer should have cited as grounds for reversal the prosecutor's repeated inquiries to jurors whether they had the strength of character and the courage to impose the death penalty if they thought it was the appropriate sentence. He further asked them if they had the courage of their convictions to stand by that sentence if the trial court polled them after sentencing. Defense counsel's strategy was a mirror image: they attempted to draw out the prospective jurors who were predisposed to vote for the death penalty in order to strike them from the jury pool. The prosecutor's questions merely allowed him the similar opportunity to strike jurors who would not vote for the death penalty even if they thought it was warranted. Trial and appellate counsel both performed reasonably on this point.

Baer also says Maynard should have appealed by citing the fact that the prosecutor told the jurors the facts of the crime and then told the jury that these facts warranted death. (Appellants Br. at 24.) Here, too, the defense and the prosecution both found elaborating on the facts useful in the struggle over whether the sentence should be death. Baer's counsel told the jury "I'm telling you right now up front, he committed these crimes. He cut the throat of a mother. He cut the throat of her four-year-old daughter." (Trial. Tr. at 641.) When the trial judge questioned the extensive recitation of facts occurring during voir dire, Baer's counsel told the court that he wanted the jury to know the facts as part of a technique called "stripping."[6] (Trial Tr. at 875.) Baer's appellate counsel could not be ineffective for not raising this argument

---

[6] According to the testimony on PCR, "stripping" involves asking jurors their opinion about a hypothetical murder of a completely innocent person with no defenses. (PCR Tr. at 617–19.) The idea seems to be that those jurors who say only death is suitable for the hypothetical defendant would be struck for cause. (PCR Tr. at 617–19.) Baer's counsel apparently decided to use this technique, but used the facts of Baer's actual crimes rather than a hypothetical. (See Trial Tr. at 875–76.) Baer's trial counsel stated "I'm happy to go on the record as saying that Mr. Williams and I have thought this case through and our approach through. It is the exercise of our independent professional judgment to take this tactic and that we have consulted with our client thoroughly about this." (Trial Tr. at 886.) Uncommon as such declarations are in capital cases, they seem based in fact.

23

on direct appeal because trial counsel made a reasonable professional judgment to allow the jury to hear the facts of the case during voir dire.

As for the prosecutor's declaration that the facts warranted death, the prosecutor told the jury during voir dire that the State was seeking justice for the family because they would be without a mother and a child. (Trial Tr. at 378, 405, 480.) During the penalty phase, he told the jury it should sentence Baer to death because that was what the family wanted. (Trial Tr. at 2551.) Inappropriate though these comments may have been, we do not think they rendered Baer's trial fundamentally unfair. The trial court ruled that the prosecutor's statements at voir dire did not constitute victim impact evidence but told the prosecutor not to get that close to the line again. (Trial Tr. at 803–04.) The prosecutor then told the jury he misspoke. This is the sort of rebuke to the prosecutor that defense counsel likely found helpful.

Baer next contends that his appellate counsel was ineffective for not arguing that his trial was unfair because the prosecutor disparaged Baer, disparaged his counsel, and disparaged Baer's experts.[7] (Appellant's Br. at 26–28.) Many of the comments directed at Baer and his experts were fair comments on the evidence. The comments directed at Baer's attorney, when read in full, are hardly misconduct.

To take a few examples, the prosecutor commented in his closing argument on Baer's demeanor: "You've got a better look at him then I do because I am over here, but he seems to be joking around and talking to people in the audience all the time." (Trial Tr. at 2061.) During the penalty phase, the prosecutor quoted trial counsel's opening statement at trial and asked the jury to consider whether Baer's crimes were among "the worst of the worst." (Trial Tr. at 2513.) Based on his experience, he thought that they were. (Trial Tr. at 2513.) He conceded that jurors might think the September 11 terrorist attacks or the Oklahoma City bombing were worse but asked that they consider the actual facts of Baer's murders. (Trial Tr. at 2514.) The prosecutor then recounted the facts of the murders in graphic detail. (Trial Tr. at 2514.)[8] During rebuttal,

---

[7] As characteristic of such statements, Baer points to the prosecutor's comment that "I don't think anybody in this courtroom likes him." (Trial Tr. at 558.)

[8] Contrary to Baer's argument, the prosecutor did not directly compare Baer to the perpetrators of the September 11 terrorist attacks or the Oklahoma City bombing. (Trial Tr. at 2513.) He was arguing that

the prosecutor referenced the hardships he himself faced while growing up and the time he spent in jail to argue that Baer was using his own childhood as an excuse that should save him from the death penalty. (Trial Tr. at 2548–50.) He also briefly mentioned the cost while telling the jury that the State was not seeking the death penalty haphazardly. (Trial Tr. at 2551.) Each of these arguments was a response to arguments made by defense counsel. (Trial Tr. at 2540–41, 2525–30.)

Baer asserts that these various statements violated his Fifth, Sixth, and Fourteenth Amendment rights. To the extent that any comments directed at Baer, his counsel, or his experts were misconduct, any impact on the fairness of Baer's trial was minimal. Even if taken in the aggregate, these comments did not affect the outcome of Baer's trial.

### B. Appropriateness of the Death Penalty

Second, Baer argues that Maynard inadequately challenged the appropriateness of Baer's death sentence. (Appellant's Br. at 36–38.) Maynard's brief contained only twenty-one lines of argument on the appropriateness of the death penalty and incorporated other issues in his brief. (PCR Ex. at 19, 21–22.) He did not argue that Baer's mental illness precluded his execution based on recent holdings from the U.S. Supreme Court limiting the application of the death penalty. See, e.g., Kennedy v. Louisiana, 554 U.S. 407, 421–24 (2008) (defendant who raped but did not kill a child); Roper v. Simmons, 543 U.S. 551, 568 (2005) (juveniles); Atkins v. Virginia, 536 U.S. 304, 321 (2002) (mentally retarded).

---

even though other crimes were worse, that should not preclude the jury from imposing the death penalty in Baer's case. (Trial Tr. at 2513.) Defense counsel also had a chance to respond to this perceived impropriety, which was their avowed strategy throughout the trial. (Trial Tr. at 2525–47; PCR Tr. at 32.)

Moreover, a prosecutor may respond to the allegations and inferences trial counsel makes even if the way he responds would otherwise be objectionable. Cooper v. State, 854 N.E.2d 831, 836 (Ind. 2006). Baer's trial counsel first brought up the financial burden of execution. (Trial Tr. at 427, 2540–41.) Both of Baer's trial counsel talked about their own families and upbringings as a contrast to Baer's family and upbringing. (Trial Tr. at 2527, 2532, 2544–45.) Then his counsel argued that Baer committed his crimes because society failed him. (Trial. Tr. at 2532.) The prosecutor's comments about his own rough upbringing was a fair rebuttal to these points made by Baer's counsel.

When Indiana law placed capital-sentencing decisions fully in the hands of trial judges, this Court set aside multiple death sentences by exercise of our power to review and revise sentences, sometimes finding death "inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B); see also Ind. Const. art. VII, § 4. Sentencing is now largely in the hands of juries, and as we observed in Wilkes v. State, 917 N.E.2d 675, 693 (Ind. 2009), we have affirmed sentences in cases much like Baer's. Maynard's argument sufficed.

As for whether Maynard should have tried to break new ground, the U.S. Supreme Court has never held that the U.S. Constitution precludes executing the mentally ill. See Baird v. State, 831 N.E.2d 109, 115–16 (Ind. 2005). In fact, this Court has expressly held that the U.S. Constitution does not, and we have held, with one dissent, that the Indiana Constitution does permit the State to execute the mentally ill. See, e.g., Matheney, 833 N.E.2d at 457 (Article I, Section 16 of the Indiana Constitution); Baird, 831 N.E.2d at 111 (same). These holdings reflect in part the fact that "mental illness" is a very elastic term. The relative seriousness or mildness of a defendant's illness is well suited to the weighing process that occurs when considering aggravators and mitigators and not well suited to reliable bright lines that would place a defendant as eligible or ineligible.

## C.      Rejection of Baer's GBMI Plea

Third, Baer says Maynard should have challenged the trial court's rejection of his GBMI plea. (Appellant's Br. at 34–36.) He argues that there was a sufficient factual basis for the plea because two court-appointed mental health experts, Dr. Davis and Dr. Lawlor, both thought Baer was mentally ill. (Appellant's Br. at 35–36; Direct Appeal App. at 1491, 1581.) Although both trial counsel believed that the court's rejection of Baer's plea was erroneous, Maynard did not raise this issue on appeal, apparently because he believed that such a plea required the State's agreement, which it did not give. (PCR Tr. at 23, 60, 510.)

26

The instant contention largely rests on two statutes. Indiana Code § 35-36-1-1 considers a person mentally ill if he has "a psychiatric disorder which substantially disturbs [the] person's thinking, feeling, or behavior and impairs the person's ability to function." Indiana Code § 35-35-1-3 says, "The court shall not enter judgment upon a plea of guilty or guilty but mentally ill at the time of the crime unless it is satisfied from its examination of the defendant or the evidence presented that there is a factual basis for the plea."

Baer's argument assumes that once a factual basis for a mental illness exists, a trial court is <u>required</u> to accept a GBMI plea. (<u>See</u> Appellant's Br. at 35–36.) The statute does not require a court to accept a GBMI plea once there is any factual basis for it; instead, it prohibits a court from accepting a GBMI plea without one. Indeed, we have held that a defendant does not have an absolute right to a guilty plea and that a trial court may refuse to accept one in the exercise of sound judicial discretion. <u>Elsten v. State</u>, 698 N.E.2d 292, 295 (Ind. 1998) (discretion not abused in rejecting a GBMI plea when two court-appointed physicians testified that the defendant was not mentally ill and a physician commissioned by the defendant disagreed).

Dr. Davis's and Dr. Lawlor's conclusions were not so "uncontradicted" as Baer claims. (Appellant's Br. at 35–36.) Dr. Davis thought that Baer qualified as mentally ill based on his methamphetamine addiction. (Direct Appeal App. at 1419.) Although Dr. Lawlor agreed, he did not think that "his psychiatric illnesses 'grossly or demonstratively impair[ed] his perceptions.'" (Direct Appeal App. at 1581.) The trial court also had before it a report from Dr. Groff's examination of Baer after he committed an unrelated crime shortly before the murders. (Trial Tr. at 222–23.) Dr. Groff expressly raised the possibility that Baer was malingering. (Direct Appeal App. at 1557–58.)

Based on this issue of fact, an appellate court would not have found that the trial court abused its discretion by rejecting Baer's GBMI plea and submitting the GBMI issue to the jury. We do think most appellate lawyers would have raised this contention, and they would have lost. There is not a reasonable probability that the outcome of Baer's appeal would have been different but for Maynard's failure to raise the issue. See <u>Strickland</u>, 466 U.S. at 694.

## D. Admission of Baer's Knife into Evidence

Fourth, Baer argues that Maynard was ineffective because he failed to challenge the admission of Baer's knife into evidence. (Appellant's Br. at 38.) The trial court admitted the knife over counsel's objection about relevancy. (Trial Tr. at 1557–58.) Trial counsel later moved to strike the knife at the close of evidence on the grounds that the State had not tied it to the crime, but the trial court denied the motion. (Trial Tr. at 1757.) Maynard's testimony at the PCR hearing suggested that he did not raise the issue on appeal because he thought trial counsel had not objected to it. (See PCR Tr. at 512–14.) Maynard was correct enough that this was a reason for omitting the issue on appeal, but there was a second reason.

There was substantial evidence that the knife was probative of issues the State had the burden of proving at trial, including the identity of the murderer and the manner of the murder. See Ind. Code § 35-42-1-1(1). Both Cory and Jenna Clark died of cuts to their throats that pathologist Dr. Paul Mellen testified were consistent with an intentional killing with a knife. (Trial Tr. at 1672–81.) Police later seized from Baer's apartment a knife Baer said he carried with him every day but was not carrying that day because he knew the police were looking for him. (Trial Tr. at 1421–22.) A serology examination of the sheath to Baer's knife produced a weak positive result for blood. (Trial Tr. at 1561–63.)

## E. Raising a Crawford Claim

Fifth, Baer argues that Maynard was ineffective because he failed to challenge an alleged violation of Crawford v. Washington, 541 U.S. 36 (2003). (Appellant's Br. at 38–39.) Under Crawford, testimonial hearsay is not admissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him. Crawford, 541 U.S. at 68. In this case, Court-appointed physicians Dr. Lawlor and Dr. Davis both testified that Baer was mentally ill. (Trial Tr. at 1908–09, 1929, 1992–93.) The State questioned both doctors using a report Dr. Masbaum had prepared after examining Baer in December 2004 for an unrelated case. (Trial Tr. at 1905–08, 1977–82.) Trial counsel objected both times, first on the grounds that it was outside

the scope of defense counsel's own examination, and then on grounds the prosecutor was making a spectacle using a report counsel could not cross-examine. (Trial Tr. at 1905–07, 1980.)

Dr. Lawlor had diagnosed Baer with a personality disorder but testified that he thought Baer could appreciate the wrongfulness of his actions at the time of the crimes. (Trial Tr. at 1864, 1871.) He recounted receiving reports about Baer having auditory hallucinations and ADHD as a child. (Trial Tr. at 1869–71.) Dr. Lawlor also gave a detailed account of the crimes as Baer described them to him, although he did not think that the voices Baer claimed to have heard during the murders constituted auditory hallucinations. (Trial Tr. at 1874–86.) In response to defense counsel's questioning, Dr. Lawlor stated that he did not think Baer was malingering, or faking, a mental illness. (Trial Tr. at 1893.)

When the State asked Dr. Lawlor about Baer's voices, Dr. Lawlor maintained that Baer's description did not indicate a split personality and that Baer did not mention anything about a voice called "Super Beast." (Trial Tr. at 1904–05.) Defense counsel quickly objected on grounds of relevance when the prosecutor asked Dr. Lawlor to review a report from Dr. Masbaum, but the trial court overruled the objection to the extent that the report was relevant to the issue of malingering. (Trial Tr. at 1905–07.) According to Dr. Masbaum's report, Baer once tried to present himself to Masbaum as having a split personality, telling Dr. Masbaum that he was talking to "Fred" on one day but talking to "Michael" on another. (Trial Tr. at 1907.) Dr. Lawlor conceded that Baer could have been malingering, to Dr. Masbaum if not to him, and that this information was inconsistent with his diagnosis because "typically, the discrete personalities aren't aware of each other's existence." (Trial Tr. at 1908.)

Dr. Davis then testified that he considered Baer mentally ill to the level of having a mental disease or defect. (Trial Tr. at 1929.) According to Dr. Davis, Baer admitted committing the murders and described having auditory hallucinations, hearing voices, and having a raging, out-of-control part of himself that "came out" on the day of the murders. (Trial Tr. at 1922.) Baer had called this raging part of himself Super Beast. (Trial Tr. at 1923.) Dr. Davis also reviewed Baer's childhood experiences with depression, custody issues, hospitalization for suicide attempts, prescription drug use, and illicit drug abuse. (Trial Tr. at 1925–28.) Finally, he

29

discussed the clinical link between drug abuse and psychosis, one that might materialize in some patients but not in others.  (Trial Tr. at 1929–37, 1940–43.)

In response to the State's questioning, Dr. Davis stated his impression that the phrase "Super Beast" did not refer to a voice Baer heard but rather to the "raging part of him."  (Trial Tr. at 1977.)  After the prosecutor and Dr. Davis speculated over whether Super Beast originated from a tattoo on Baer's left forearm, the prosecutor asked Davis to read passages from Dr. Masbaum's report suggesting that Baer had heard voices since he was a child that appeared to come from a Winnie the Pooh doll.  (Trial Tr. at 1978–80.)  After the prosecutor asked Dr. Davis if Baer thought that voices telling him to kill his brother came from the Winnie the Pooh doll, trial counsel objected, "Mr. Puckett is having a pretty good time, but I can't cross-examine that report. . . .  He's made fun of my client for claiming that he heard Winnie the Pooh when that's not what the report said, so I'm going to object to this.  This is not funny."  (Trial Tr. at 1979–80.)

Giving Baer the benefit of the doubt as to the form of defense counsel's objections, a defendant has a right to be confronted with witnesses against him in a criminal prosecution.  The Confrontation Clause of the Sixth Amendment effectively codified existing common law, which prevented a trial court from admitting testimonial hearsay statements unless the State showed both that the declarant was unavailable to testify and that the defendant had a prior opportunity to cross-examine the declarant.  Crawford, 541 U.S. at 53–54.

Although the U.S. Supreme Court did not comprehensively define the breadth of testimonial statements in Crawford, it did describe a core class of testimonial statements that included (1) ex parte in-court testimony such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; (2) extrajudicial statements contained in formalized testimonial materials, affidavits, depositions, prior testimony, or confessions; and (3) statements made under circumstances that would lead an objective witness to reasonably believe that the statement would be available for later use at a trial.  Id. at 51–52.

30

Regardless of whether the trial court should have admitted this evidence under Crawford, Maynard's decision not to present this issue on appeal did not prejudice Baer because admitting it for this limited purpose constituted harmless error. The jury heard evidence from two experts that Baer was mentally ill to the level required by Ind. Code § 35-36-1-1. (Trial Tr. at 1908–09, 1929, 1992–93.) It heard evidence that Baer suffered from ADHD and depression as a child, that he was hospitalized, that he used prescription drugs, and that he eventually started huffing and abusing illicit drugs. (Trial Tr. at 1925–28.) It heard evidence that chronic drug abuse could damage a person's mental abilities to the point of near-retardation and could exacerbate any preexisting mental illnesses. (Trial Tr. at 1929–37, 1940–43.) It is unlikely that a jury unconvinced by this evidence would have entered a GBMI verdict or recommended a sentence of life if only the State had not cross-examined Dr. Lawlor and Dr. Davis mentioning Dr. Masbaum's report.

### F.    Penalty-Phase Jury Instructions

Sixth, Baer argues that Maynard should have challenged certain penalty-phase jury instructions. (Appellant's Br. at 39–41.) Because trial counsel failed to raise an objection to these instructions, Maynard was faced with presenting them as fundamental error. Ritchie v. State, 809 N.E.2d 258, 273–74 (Ind. 2004). The four instructions Baer references here are the same mentioned on trial counsel ineffective assistance of counsel: omitting reference to "intoxication" on mitigation; stating that intoxication that appeared in the statutory definition; stated that intoxication was not a defense in a prosecution for any crime; using the instruction on insanity and lay witness testimony; and not declaring that life without parole really did mean life without parole. (Appellant's Br. at 39–41.)

Maynard could reasonably decide not to challenge omission of the "intoxication" phrase. After all, the same jury instruction required the jury to consider the fact that the defendant "was under the influence of extreme mental or emotional disturbance" and that his capacity to appreciate the criminality of his conduct or to conform it to the law "was substantially impaired as a result of mental disease or defect." (PCR App. at 637.) Given the link between ongoing methamphetamine usage and mental illness that repeatedly arose in expert testimony, the jury

31

had an adequate opportunity to hear and act on this evidence even with the omission of "or of intoxication" from the jury instruction. (Trial Tr. at 1872–73, 1897–1901, 1929–37, 1940–46.)

Likewise, Maynard's decision not to challenge the instruction that intoxication was not a defense to commission of any crime did not prejudice Baer's appeal because as we noted above it did nothing to muddy the waters by implying that intoxication could not be a mitigator. (Appellant's Br. at 40.)

Maynard's decision not to challenge the court's instructions that a lay witness could express an opinion on sanity and that the jury must weigh both lay and expert testimony to determine whether Baer was insane or mentally ill did not prejudice Baer's appeal. Giving the instructions did not amount to fundamental error. Trial counsel made perfectly clear that they were seeking a GBMI verdict, not raising an insanity defense. (Trial Tr. at 1908–09, 2105.)

Finally, Maynard's decision not to challenge the court's failure to instruct that life without parole really did mean life without parole must be viewed against the fact that that sentencing statutes do in fact change over time. The most a trial court could have told the jury was that the present statutes do not permit parole, something the jury obviously already knew.[9]

---

[9] Baer relies on Schafer v. South Carolina, 532 U.S. 36 (2001), for the proposition that due process requires an instruction that life without parole really does mean life without parole whenever future dangerousness is at issue. (Appellant's Br. at 41.) Schafer actually applies to the instance of not telling a jury that a facially ambiguous phrase like "life imprisonment" or "imprisonment for life" or some other such variation carried no possibility of parole. See Schafer, 532 U.S. at 48 & n.4. As the Court noted, excluding convicts of certain crimes from the possibility of parole was a recent development, so a jury might not know whether a phrase like "life imprisonment" excluded the possibility of parole. Id. at 52–53.

The jury instructions in Baer's penalty phase and the Indiana statute on which it was based clearly used the unambiguous phrase "life without parole." (PCR App. at 637.) As trial counsel explained to prospective jurors:
> There are a couple of others [prospective jurors] that said that they thought it was thirty (30) or forty (40) years. Okay. You're right if we were in Colorado. Life without parole in some other states means that the person who is sentence [sic] for life is eligible to be considered for parole in forty (40) years. Not in Indiana. In Indiana, life without parole means life without parole.

(Trial Tr. at 428.)

### G. Requesting Co-Counsel

Finally, Bear argues that Maynard should have requested co-counsel. (Appellant's Br. at 41–42.) He does not cite any authority for the proposition that reasonably effective performance requires co-counsel on appeal. (Appellant's Br. at 41–42.) Baer does point to the testimony of expert witness Monica Foster, a good source, who thought a capital appeal was such an "enormous undertaking" that no single lawyer could handle one without co-counsel. (Appellant's Br. at 41–42; PCR Tr. at 715–16.)

Neither the ABA Model Rules of Professional Conduct nor the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases require appellate counsel to associate with co-counsel. We decline to hold that not requesting co-counsel in a capital appeal falls below that standard required by the Sixth Amendment. See Lowrey v. State, 640 N.E.2d 1031, 1041 (Ind. 1994).

Baer notes that "[e]nlisting co-counsel could only have helped Maynard formulate and present all arguably meritorious issues." (Appellant's Br. at 41–42.) Maynard had been practicing law for twenty-seven years and specialized in personal injury and criminal defense. (PCR Tr. at 497.) Given the deferential standard of review Maynard was facing on many issues on appeal and the overwhelming evidence of Baer's guilt, we cannot say that requesting co-counsel would have changed the outcome. See Strickland, 466 U.S. at 694.

### IV. Taylor's Testimony Is Not Newly Discovered Evidence.

Baer claims that previously undiscovered evidence reveals his longstanding psychosis, undermining confidence in his sentence. (Appellant's Br. at 84–87.) The evidence he cites is PCR testimony by Earl Taylor, a former fellow inmate from the late 1990's, before Baer committed these double murders. (PCR App. at 349.) Taylor testified that "most of the time,

[Baer] appears to be reasonable, sane, and lucid. Other times, when the voices take over, he is completely the opposite." (PCR App. at 349.)

To qualify as newly discovered evidence, the evidence must be discovered since the trial and the defendant must have used due diligence to discover it before trial. Stephenson v. State, 864 N.E.2d 1022, 1050 (Ind. 2007). Even if counsel were unaware of witnesses before trial, the statute requires diligence in discovering them and places the burden on Baer to show why the testimony was unavailable at trial. Id. at 1053. To establish that newly discovered evidence undermines the confidence in his sentence, Baer must show a reasonable probability of a different result had the evidence been known at the time of the trial. Id. at 1049.

The PCR court disregarded Taylor's testimony because Baer "obviously knew of any conversations he might have had with Taylor over a several-year period," and therefore Baer had not shown Taylor was unavailable at trial, "an essential showing required by I.C. 35-50-2-9." (PCR App. at 349.) Rejecting Baer's argument that he could not be expected to participate in his own defense, the PCR court noted that there had never before been any such suggestion about Baer's competence. (PCR App. at 350.) The PCR court pointed to Baer's ability to assist his counsel and his capability "of understanding that he might have benefited from telling his trial attorneys his pre-arrest conversations with Taylor." (PCR App. at 350.) He also understood that "he might benefit from portraying himself as being incapable of killing Cory and Jenna Clark because, he asserted, he is so 'soft and sentimental' that he cries 'when a freakin' butterfly gets hit on the windshield.'" (PCR App. at 350.)

On appeal, Baer reiterates that his mental state precludes the court from holding him responsible for assisting in his defense. (Appellant's Br. at 87.) He also argues, "Taylor's testimony concerning Baer's long-standing auditory hallucinations, corroborated at PCR by counselor Ogden and ex-wife Brown, undermines confidence in Baer's death sentence." (Appellant's Br. at 87.)

The PCR court was not clearly erroneous in concluding that Baer has not met the burden required for relief on new evidence. While additional evidence about Baer hearing voices during

an earlier prison stay would be material, the record at trial presented considerable evidence and evaluation of the "voices question." What Taylor has to add does not suggest a reasonable probability of a different result.

## VI.    Baer's Potential Mental Retardation

The record contains very occasional mention of mental retardation.  We thus pause to consider whether there might be any claim under Atkins v. Virginia, 536 U.S. 304 (2002), though none of his lawyers nor any of the multitude of medical experts have made this an issue.

Dr. Richard Lawlor and Dr. Philip Harvey, two of the experts who testified at PCR, tested Baer's IQ.  (PCR Tr. at 336; PCR Ex. 15.)  Dr. Lawlor tested Baer's IQ in December 2004, and Dr. Harvey tested it in 2008.  (Direct Appeal App. at 1581; PCR Ex. 15.)  The test result administered by Dr. Lawlor was a borderline score of sixty-nine to seventy-one, and the test administered by Dr. Harvey was in the low eighties.  (PCR Tr. at 336; PCR Ex. 15.)  As Dr. Harvey acknowledged, Baer had been incarcerated and under psychiatric treatment for several years, so he based his conclusions about Baer's mental state at the time of the crime on the assumption that his cognition in 2008 was "at least not likely to be worse" than at the time of the crime.  (PCR Tr. at 282–84.)  This is because "[s]ubstance abuse-related disorders improve fairly substantially during periods of abstinence."  (PCR Tr. at 282.)  Therefore, Baer's cognitive performance data Dr. Harvey collected "is quite likely an underestimate of his level of cognitive impairment at the time of the crime."  (PCR Tr. at 282.)

Dr. Lawlor concluded that the 2004 test results meant Baer "would be a person who, with effort and motivation, could pass in school, but it would take a lot of motivation and effort with that level of functioning.  And he certainly wouldn't be an honor roll student."  (PCR Tr. at 336.)  After discussing Dr. Harvey's IQ test results, Dr. Lawlor expressly stated that Baer "is not mentally retarded."  (PCR Tr. at 336.)

35

Dr. Harvey did not discuss the IQ results in his report at PCR, but he did discuss Baer's cognitive abilities. (PCR Tr. at 272–74.) He found that Baer "has a wide range or scatter in his abilities. There are a number of his abilities that I examined that are essentially in the average range of performance." (PCR Tr. at 272.) As an example, Baer's vocabulary scores were "above average for someone with his educational attainment and his opportunities." (PCR Tr. at 273.) On the other hand, other aspects of his performance, such as his working memory, were "quite impaired." (PCR Tr. at 273.) Further, Dr. Harvey found that Baer's "family history is positive for mental retardation," though he did not attribute any significance to this observation. (PCR Tr. at 299.)

In Atkins, the U.S. Supreme Court, citing the American Psychiatric Association's definition, noted that "mild" mental retardation applies to people with an IQ level of fifty or fifty-five to approximately seventy. Atkins, 536 U.S. at 309 n.3. In State v. McManus, this Court restated what qualifies as "significantly subaverage intellectual functioning" under Ind. Code § 35-36-9-2: "a person is considered to meet the subaverage intellectual functioning component if the person's full-scale IQ test score is two standard deviations below the mean; i.e., an IQ between 70 and 75 or lower." 868 N.E.2d 778, 785 (Ind. 2007) (quoting Woods v. State, 863 N.E.2d 301, 304 (Ind. 2007)); see also, Atkins, 536 U.S. at 308 n.3.

In McManus we concluded that the post-conviction court's finding that the defendant was significantly subaverage was clearly erroneous and not supported by the record. McManus, 868 N.E.2d at 787. McManus presented scores from five IQ tests, all of which indicated scores of seventy or above and three of which indicated scores above the seventy to seventy-five cutoff. Id. at 785–86. The record also included expert testimony that McManus was not within the definition of mental retardation. Id. at 786.

Given our holding in McManus and the extensive record in Baer's case, it appears that the Eighth Amendment does not bar application of the death penalty on grounds of retardation.

## Conclusion

We affirm.

Dickson, Sullivan, Rucker, and David, JJ., concur.