## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 23 2016, 9:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Abdullah Alkhalidi,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

September 23, 2016

Court of Appeals Case No.
71A03-1602-PC-377

Appeal from the St. Joseph Superior Court

The Honorable Jane Woodward Miller, Judge

Trial Court Cause No.
71D01-1011-PC-53

**Baker, Judge.**

[1] Abdullah Alkhalidi appeals the denial of his petition for post-conviction relief, arguing that the post-conviction court erroneously determined that his trial attorney was not ineffective. Finding no error, we affirm.

## Facts

[2] In November 1999, the State charged Alkhalidi with murder, class D felony theft, felony murder, class A felony attempted robbery, and class A felony robbery. After a jury trial in 2000, Alkhalidi was convicted of murder, robbery, and theft. The trial court sentenced Alkhalidi to an aggregate sentence of sixty-five years imprisonment, and after a direct appeal, our Supreme Court affirmed the convictions. *Alkhalidi v. State*, 753 N.E.2d 625 (Ind. 2001) (*Alkhalidi I*). In 2002, Alkhalidi filed a petition for post-conviction relief, which the trial court granted, ordering a new trial.

[3] After the new trial was ordered, Alkhalidi's attorney withdrew. On June 21, 2007, the trial court appointed Phillip Skodinski to represent Alkhalidi. Eventually, Skodinski retained private investigators Howard Radde and Fred Franco, Jr.,[1] to help with Alkhalidi's case.

[4] On September 13, 2007, the deputy prosecutor sent a letter to Skodinski, offering a plea agreement. The prosecutor stated that if Alkhalidi would plead guilty to class A felony robbery and class D felony auto theft, the State would

---

[1] Franco is also a licensed attorney but worked only as a private investigator on Alkhalidi's case.

dismiss the remaining charges. The letter gave a deadline of September 21, 2007, for Alkhalidi's response to the offer. Jail records show that Franco visited with Alkhalidi on September 12 and 18, 2007; the visitor log does not show that Skodinski visited during this timeframe. Radde was also present at these visits—the log does not show that he was in attendance—and his invoice stated, "9/18/07…Met with Defendants [sic] attorney at jail[.]" PCR Ex. 1. Radde's invoice also stated that on September 25, 2007, he "visit[ed] jail to discuss plea offer by State[.]" *Id.* The jail did not log incoming mail addressed to the inmates, though Alkhalidi later testified that he never received any mail from Skodinski while awaiting the retrial.

[5] On October 1, 2007, Alkhalidi moved to replace Skodinski, alleging that Skodinski was unprepared and had failed to communicate adequately with Alkhalidi. The trial court scheduled a hearing on Alkhalidi's motion for October 16, 2007. On October 9, 2007, Alkhalidi sent a letter to the trial court stating that "on 9-20-2007 PD Skodinski advised me of the State plea offer to crimes 'charges' [sic] that was dismissed by the court on November 5, 1999[.]" *Id.* At the hearing on Alkhalidi's motion, the following discussion occurred:

> Alkhalidi: . . . [F]rom the period of late August and early September, was there is a plea negotiation between my attorney. Which is the only thing I'm aware of is there is a plea investigation. In September 24, you know, I noticed that. They can't let me know, say, well, this is what they offer you. They offer you a class B, you know, a class A, you know.

***

Prosecutor: The problem, yes, we did send a letter to Mr. Skodinski. . . . [w]ith a timeline on it, with a plea offer, and it was told to us that he had no interest in it.

Alkhalidi: Oh, that's correct. I have not get the letter. The letter, you know, I specifically, because if there's negotiation, if there is a period, I was supposed to be involved. I'm supposed to know that—

Court: He transmitted it to you.

Alkhalidi: No.

Court: He told you about it.

Alkhalidi: Yes, he told me about it.

Court: Yeah.

Alkhalidi: But that was exactly the date. I mean, the time's already expired, and it's for the crime is not even on the [inaudible]. The crime has to be dismissed, in '99.

Court: Well that doesn't really—I mean you can plead to things that aren't currently filed. People can plead to things that aren't currently filed.

Alkhalidi: No. The state has to file a motion to dismiss the charges, and it was dismissed by the Court.

Court:      But they can refile that charge, and you can plead to that.

Alkhalidi:  That's true, within the statute of limitations. I mean, because I was charged with a class D felony, and it's [sic] nine years have passed.

Court:      You can plead to anything that an agreement is made to plead to.

Alkhalidi:  Yeah, but I have to be aware of. Now you're bringing it to me after the deadline has passed. I mean the invoice I got here, it says exactly. The Court can read it.

                                ***

Court:      And you're saying that you were never told about this offer until after September 21st. Is that what you're saying to me?

Alkhalidi:  Yes.

Court:      But you're also saying to me that you weren't going to accept the offer; is that right?

Alkhalidi:  Because if I know what the offer is, you know—

Court:      Okay. You know what the offer is. You know what the offer is.

Alkhalidi:  Exactly. And the offer, basically, it does not match what I was charged with.

Court: But, Mr. Alkhalidi, he has an obligation to tell you which plea offers are made. He's told you what plea offer was made. You're saying you're not even going to accept it anyway. So I'm not exactly understanding. I'm not exactly understanding where the problem is.

\*\*\*

Alkhalidi: . . . [N]egotiations is supposed to be as open and counter offer. Only approach, she has one side. You can take it or leave it.

Court: It can be either way.

Alkhalidi: Yeah. That's what I'm asking for. You know, I didn't have that opportunity.

Court: Oh. You were going to make a counter offer? Well why don't you tell your attorney what the counter offer is that you want to make, and I would imagine that the state would listen to it.

Retrial Tr. Addendum p. 126-131. Alkhalidi changed the subject to lack of communication with Skodinski and never explained what his counteroffer would have been. At the close of the hearing, the trial court denied Alkhalidi's motion.

[6] Following discovery, Alkhalidi's retrial occurred in April 2008. Following the retrial, the jury found Alkhalidi guilty as charged and the trial court again imposed a sixty-five-year aggregate sentence. After Alkhalidi filed a direct

appeal, this Court affirmed and our Supreme Court denied transfer. *Alkhalidi v. State*, No. 71A03-0810-CR-481 (Ind. Ct. App. Aug. 27, 2009) (*Alkhalidi II*), *trans. denied*.

[7] In November 2010, Alkhalidi filed a petition for post-conviction relief, and on April 28, 2014, Alkhalidi filed an amended petition. He raised multiple grounds for relief, though only one is relevant in this appeal—Skodinski's alleged failure to inform Alkhalidi of the State's plea offer before the response time had expired.

[8] The post-conviction court held a hearing on Alkhalidi's petition on November 20, 2015. Alkhalidi did not subpoena Skodinski to testify at the hearing. Franco and Radde testified that they did not recall ever discussing a plea agreement with Alkhalidi. Alkhalidi testified that he learned of the plea offer in late September or early October, after the September 21 deadline. He also testified that, had he known of the offer, he would have accepted it or, "at the least, I will submit a counter offer." PCR Tr. p. 64. But Alkhalidi also acknowledged the letter that he had written the trial court that stated he had learned about the plea offer on September 20, 2007. *Id.* at 75. He eventually backtracked from that letter, stating that he had gotten the date wrong. *Id.* at 80. The State presented no evidence at the hearing. On January 19, 2016, the post-conviction court denied Alkhalidi's petition, finding, in pertinent part, as follows:

Findings of Fact

***

Alkhalidi claims that his lawyer never met with him in the time between when the [plea] offer was made and when it expired and that counsel never conveyed this offer to him.

Petitioner supported this claim with both his testimony and the testimony of Fred Franco. . . . Franco's testimony conflicts with a document in the court records. The document, a November 7, 2007 invoice for Franco's services, was submitted to the court for payment. The billing record itemized a September 18, 2007 meeting at the jail with Franco and Skodinski, a meeting held only a few days after the plea offer was conveyed to counsel. According to that record, Mr. Skodinski and Franco met at the jail for ninety minutes. [fn 3] In addition, an invoice entry for September 25, 2007, notes that Franco again met with Alkhalidi and discussed the plea offer. Given the contradiction between Franco's 2015 testimony and his 2007 billing records, the Court finds Franco's post-conviction statements unpersuasive.

> [fn 3] The jail log does not list Mr. Skodinski as a visitor. Alkhalidi relied upon the jail log as proof his attorney did not tell him about the plea offer.

Petitioner's claim also conflicts with a letter he sent to the court in October, 2007. . . . In the letter, Alkhalidi relayed a litany of complaints about his attorney's performance. [The post-conviction court quotes the portion of the letter stating that Skodinski advised Alkhalidi of the plea offer on September 20, 2007.] Although the October 10 letter contained a number of complaints, it did not include a complaint that the plea had been communicated to Alkhalidi after the offer had expired.

. . . [At the hearing on Alkhalidi's motion for a new attorney,] it was unclear whether Petitioner was more concerned that the

State's offer had been belatedly conveyed to him, or whether Alkhalidi was more focused on his belief the offer was, in part, based on charges that had already been dismissed. . . .

\*\*\*

[The post-conviction court then spends significant time examining Alkhalidi's testimony at his retrial, emphasizing that Alkhalidi asserted his innocence during the trial, at sentencing, and during post-conviction proceedings.]

\*\*\*

Conclusions of Law

\*\*\*

The evidence of the timing, transmittal and termination of the State's plea offer to Alkhalidi is in conflict. Rather than focusing on counsel's performance and deciding *when* Mr. Skodinski conveyed the state's offer to Petitioner, the court can better address this claim by focusing on *whether* Petitioner would have been prejudiced by a failure to convey the offer in a timely manner. . . . If Alkhalidi was not prejudiced by his attorney's alleged deficient performance, then Petitioner's claim must fail.

\*\*\*

. . . Alkhalidi maintained his innocence throughout the course of the proceedings. Before trial, he sent a number of letters to the Court and to counsel professing his innocence. At trial, Alkhalidi raised his hand, promised to tell the truth, and sat in the witness chair. As Alkhalidi sat and testified, he repeatedly and robustly denied any role in the robbery and murder . . . .

[His testimony and protestations of innocence] lead this Court to conclude that Alkhalidi would not have accepted the State's plea offer. Furthermore, if he had accepted the offer, he would have been required to provide an acceptable factual basis for a plea to a class A [felony] robbery. In light of Alkhalidi's emphatic denials of involvement in [the] charged robbery, the Court would have been in legally treacherous water accepting a plea.

Ultimately, Alkhalidi's claims of innocence have presented a formidable barrier to persuasion that Petitioner has not overcome. Alkhalidi has failed to meet his burden of proof on the issue of prejudice.

Appellant's App. p. 8-23 (some footnotes omitted; emphases original).

Alkhalidi now appeals.

# Discussion and Decision

[9] The general rules regarding the review of a ruling on a petition for post-conviction relief are well established:

> "The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence." *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004). "When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id.* To prevail on appeal from the denial of post-conviction relief, a petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind. 1993). Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post–Conviction Rule 1(6). Although we do not defer to the post-conviction

court's legal conclusions, "[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Ben–Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (quotation omitted).

*Hollowell v. State*, 19 N.E.3d 263, 268-69 (Ind. 2014).

[10] A claim of ineffective assistance of trial counsel requires a showing that: (1) counsel's performance was deficient by falling below an objective standard of reasonableness based on prevailing professional norms; and (2) counsel's performance prejudiced the defendant such that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Davidson v. State*, 763 N.E.2d 441, 444 (Ind. 2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "A reasonable probability arises when there is a 'probability sufficient to undermine confidence in the outcome.'" *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (quoting *Strickland*, 466 U.S. at 694). "Failure to satisfy either of the two prongs will cause the claim to fail." *Gulzar v. State*, 971 N.E.2d 1258, 1261 (Ind. Ct. App. 2012). However, "[i]f we can easily dismiss an ineffective assistance claim based upon the prejudice prong, we may do so without addressing whether counsel's performance was deficient." *Baer v. State*, 942 N.E.2d 80, 91 (Ind. 2011). "Indeed, most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone." *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002).

[11] We agree with the post-conviction court that this case can and should be dispensed with on the prejudice prong of the *Strickland* test. With respect to prejudice, a defendant who claims his attorney was ineffective for failing to inform the defendant of a plea offer must show that (1) there was a reasonable probability that he would have accepted the plea offer had his attorney told him about it, and (2) the plea offer would have been accepted by the trial court. *Missouri v. Frye*, 132 S.Ct. 1399, 1411 (2012) (applying and interpreting *Strickland*); *see also Lafler v. Cooper*, 132 S.Ct. 1376, 1391 (2012) (noting defendant's obligation to show a reasonable probability that he and the trial court would have accepted the guilty plea had it been communicated to him by his attorney). A defendant who proves deficient performance and provides proof of a sentencing disparity between an offer and the charged offenses may have a prima facie case establishing prejudice. *Woods v. State*, 48 N.E.3d 374, 383 (Ind. Ct. App. 2015). But a post-conviction court is neither required to ignore other evidence that may exist in the record nor grant relief on this bare showing of a prima facie case alone. *Lafler*, 132 S.Ct. at 1385 (noting that other evidence, such as proof of intervening circumstances or the court's perspective regarding the terms of the plea offer, may also be considered in deciding a *Strickland* prejudice claim).

[12] Initially, we note that the record is wholly opaque as to whether Alkhalidi would have accepted the plea offer. At a hearing before the retrial, Alkhalidi testified that he would not have accepted the plea offer because "it does not match what I was charged with." Retrial Tr. Addendum p. 130. He also

complained that the statute of limitations had passed for the charges to which he would have pleaded guilty under the offer. *Id.* at 127-28. Alkhalidi indicated that he may have wanted to make a counteroffer to the prosecution, but changed the subject when asked what the counteroffer would have been. *Id.* at 131. Then, at the post-conviction hearing, Alkhalidi equivocated on whether he would have accepted the plea offer. Initially, he testified that he would have accepted it, but then stated "at the least, I will submit a counter offer" and that "I would either offer a counter offer to that offer or accept." PCR Tr. p. 63, 66.

[13] To determine whether Alkhalidi sufficiently showed that he would have accepted the plea deal, we must also examine the underlying facts of the offenses and his pre- and post-retrial statements. As described by this Court in *Alkhalidi II*, the facts of Alkhalidi's offenses are as follows:

> On May 2, 1999, Claude Purdiman ("Purdiman") and his brother, Terrance Purdiman ("Terrance"), were at the home of their father. Purdiman showed Terrance and his father $3,000 and said that he was going to the Blue Chip Casino in Michigan City, Indiana. Purdiman and Terrance left their father's house at the same time in separate cars. Terrance went to Benton Harbor and Purdiman turned off the highway to go to the casino. A surveillance tape from the Blue Chip Casino showed Alkhalidi and Purdiman leaving the casino at the same time around 2:37 in the morning on May 3, 1999.
>
> On May 3, 1999, around 12:30 or 1:00 p.m., Purdiman spoke with Kimberly Holmes and Marjorie Scott in South Bend, Indiana. Purdiman said that he was going over to Alkhalidi's house because they were going back to the gambling boat.

On May 4, 1999, a neighbor saw Alkhalidi washing and shampooing the inside of his car and scrubbing the mats of his car. That same day, Alkhalidi went to the Blue Chip Casino and "bought in" for $1,600, which was unusual for him because his typical "buy in" was fifty to one hundred dollars. Transcript at 956–957.

After being unable to reach Purdiman, Terrance and Chantae Taylor, Purdiman's girlfriend, filed a report with the Elkhart Police on May 6, 1999. Taylor and Terrance went through some of Purdiman's personal effects at Taylor's house and found a piece of paper with Alkhalidi's phone number on it.

On May 8, 1999, a call was placed from Purdiman's cell phone at 11:01 p.m. to Dawn Schooley, a woman that Alkhalidi had a child with in 1997. That same day, the Berrien County Sheriff's Department in Michigan received a call that a body was found in the woods. The body was partially burned. The police identified the body as Purdiman. Purdiman died due to a gunshot wound to the head, which was caused by a .44 caliber or .45 caliber bullet. Purdiman's vehicle was discovered in Michigan, and it did not have a license plate.

The police spoke to a casino employee who identified the man on the video as Alkhalidi, and the police obtained Alkhalidi's address from his gaming card. The Berrien County Sheriff's Department contacted the Indiana authorities after obtaining Alkhalidi's name.

On May 13, 1999, Detective Dave Roseneau of the Berrien County Sheriff's Department and members of the State Police observed Alkhalidi's residence in South Bend, Indiana. Alkhalidi drove up to his residence and exited his vehicle. While detectives spoke with Alkhalidi, Detective Roseneau saw Purdiman's

license plate sitting in the trunk of Alkhalidi's vehicle, which was open and did not have a trunk liner.

The detectives asked Alkhalidi about the license plate. Alkhalidi became "very, very nervous" and then became "very argumentative." Transcript at 674. The detectives asked to see Alkhalidi's driver's license. Alkhalidi bent into his vehicle and got a planner out and "was acting like he was going to show" the officers his driver's license. *Id.* at 541. Alkhalidi then began patting around on the seat until Detective Roseneau said, "That's enough. Get out of there." *Id.* Alkhalidi attempted to grab the license plate out of the car. Alkhalidi came out of the car, shoved Detective Roseneau to the ground, and ran. The detectives chased after Alkhalidi until a bystander tackled Alkhalidi.

After obtaining a search warrant for Alkhalidi's house and vehicle, the police discovered the trunk liner in a trash can. The police recovered a bottle of ammonia and Purdiman's license plate from the trunk of Alkhalidi's vehicle. The police also discovered a Ruger nine-millimeter handgun, a .45 caliber cartridge, a .45 caliber spent case, a bullet, and Purdiman's driver's license in Alkhalidi's vehicle. The police discovered ammonia, wash cloths or towels, a shirt, an empty "Blue Chip matchbook," and a partially burnt piece of paper that had the word "Blue" on it in a trash can. *Id.* at 840. The police also discovered an item from the Blue Chip Casino with Purdiman's name on it. Purdiman's blood was detected on the floor mat, the towel, the paper towels, a t-shirt, the trunk mat, and the floor carpeting from the passenger seat. Alkhalidi's fingerprint was discovered on the cartridge holder.

*Alkhalidi II*, No. 71A03-0810-CR-481, at *1-*2.

[14] Before Alkhalidi's retrial, he sent multiple letters to the trial court and to his attorney professing his innocence. Appellant's App. p. 175. Alkhalidi then

testified at his retrial. He admitted that he was acquainted with Purdiman. He stated that on the night of Purdiman's death, Alshamari was driving Alkhalidi's vehicle, a Nissan, with Purdiman as the sole passenger, and Alkhalidi was following behind them in a Camaro. According to Alkhalidi, he observed a flash and the sound of a gunshot in the Nissan, which was on the road in front of him. They pulled over and Alkhalidi approached the Nissan, observing Purdiman, who appeared to be dead. Alshamari admitted to shooting Purdiman. Alkhalidi and Alshamari put Purdiman's body in the trunk of the Nissan, drove away, and eventually left Purdiman's body in a wooded area. Alkhalidi denied any involvement in the murder, the burning of the body, or the robbery. He stated that later, Alshamari gave Alkhalidi money to gamble with, but Alkhalidi did not know where the money was from. Alkhalidi testified that he had no idea how any incriminating evidence had made its way into the Nissan, the Camaro, or the trash receptacle by his house, and that his fingerprint was on the ammunition holder because police had told him to hold it in his hand during an interview.

[15] At the sentencing hearing, Alkhalidi continued to maintain his innocence on all charged offenses. Finally, when Alkhalidi filed his initial petition for post-conviction relief, he alleged that his attorney had been ineffective for failing "to advocat [sic] actual innocence claim of Petitioner Alkhalidi." Appellant's App. p. 173.

[16] This Court considered a similar set of circumstances in *Jervis v. State*, 28 N.E.3d 361 (Ind. Ct. App. 2015), *trans. denied*. In *Jervis*, the defendant sought post-

conviction relief because, among other things, he argued that his trial counsel was ineffective by failing to recommend that Jervis accept a plea offer. This Court notes that the record established that Jervis "clearly and expressly, on many occasions, professed his innocence and had no intention of pleading guilty. From his second trial leading up to his direct appeal, Jervis advanced an innocence claim." *Id.* at 367. Under these circumstances, this Court found that the defendant had failed to establish that he would have accepted the plea deal *and* that the trial court would have accepted the guilty plea over protestations of innocence. Therefore, this Court affirmed the finding that Jervis failed to show ineffective assistance of trial counsel on this basis.

[17] To sum up, the record in this case establishes the following facts:

- Leading up to the retrial, Alkhalidi repeatedly and insistently maintained his innocence in letters to the trial court and to counsel.
- Leading up to the retrial, Alkhalidi told the trial court that he would not have accepted the plea offer because it contained offenses he had not been charged with and because of his belief that the statute of limitations had expired.
- At the retrial, Alkhalidi testified that he was wholly innocent of the murder and robbery charges.
- At the sentencing hearing, Alkhalidi testified that he was wholly innocent of the murder and robbery charges.
- In his petition for post-conviction relief, Alkhalidi alleged that his trial attorney had been ineffective for failing to fully litigate a theory of innocence.
- At the post-conviction hearing, Alkhalidi was equivocal as to whether he would have accepted the plea offer, testifying that he would have made a counteroffer (which the State would have been in no way required to accept, and nothing in the record indicates that the State would have done so).

The robbery count, to which Alkhalidi would have pleaded guilty pursuant to the plea offer, alleged that Alkhalidi knowingly took money from Purdiman by using force (firing a gun) at Purdiman, causing him serious bodily injury (death). Given that Alkhalidi repeatedly and emphatically stated that he was innocent of the murder and robbery charges before, during, and after the retrial, we find that he has not established that he would have accepted the plea offer. Additionally, we find that he has not established that the trial court would have accepted the guilty plea given Alkhalidi's many protestations of innocence.

[18] Therefore, we find that the post-conviction court did not err by finding that Alkhalidi failed to show any prejudice as a result of his attorney's alleged failure to inform him of the guilty plea and that, as a result, he has not established that he received the ineffective assistance of counsel. In other words, we find that the post-conviction court did not err by denying Alkhalidi's petition for post-conviction relief.

[19] The judgment of the post-conviction court is affirmed.

Bradford, J., and Altice, J., concur.