## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 22 2018, 9:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brent R. Dechert
Dechert Law Office
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Jermaine Drake,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

August 22, 2018

Court of Appeals Case No.
18A-PC-79

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge

Trial Court Cause Nos.
18C02-0809-PC-2
18C02-0410-MR-2

**Vaidik, Chief Judge.**

# Case Summary

[1] Jermaine Drake appeals the denial of his petition for post-conviction relief. We affirm.

# Facts and Procedural History

[2] The underlying facts of this case, as taken from this Court's opinion on direct appeal, are as follows:

> Approximately one week before October 2, 2004, Drake informed two of his friends—Jordan Williams and Jordan Quinn—that his in-car television had been stolen. Drake instructed the men to contact him if they learned the whereabouts of the television.
>
> On October 2, 2004, David Adams contacted Chris Masiongale in Yorktown and informed him that he had a television to sell. Adams told Masiongale that he could keep any money over $150 if Masiongale could sell the television. Masiongale agreed and called Quinn later that day regarding the television. Quinn subsequently called Drake and informed him that Masiongale had contacted him about a television. After speaking with Drake, Quinn called Masiongale and arranged a meeting between Masiongale and Drake.
>
> After determining that Quinn would not be able to drive Drake to the meeting, Drake called Williams and informed him that "he knew who stole his tv and asked [ ] if [Williams] would go with him to go get it." Tr. p. 375. Because Williams was at Ronnie Haste's home when he received the call, he and Haste both went to Drake's apartment to pick him up. Williams drove [Haste's] black Dodge Ram to the apartment because Haste was too

intoxicated to drive. After picking up Drake, the three men drove to the arranged meeting place.

Masiongale, Adams, Kirt Trahan, and Masiongale's girlfriend, Lynds[a]y Scott, were outside Adams's home when a black Dodge Ram carrying three people arrived. Williams stepped out of the vehicle and asked to see the television. Drake also exited the vehicle, approached Masiongale and said, "Give me my shit." *Id.* at 121. Before Masiongale could answer, Drake shot him. Williams grabbed the television and said, "I got it come on," and the men got back into the vehicle and drove away. *Id.* at 206. While fleeing from the scene, Drake called his mother and "asked for two (2) tickets to California because he thought he just killed somebody." *Id.* at 385. Masiongale was taken to Ball Hospital, where he was pronounced brain dead the next morning and died after being removed from life support.

During the next few days, Williams, Scott, and Adams selected Drake's picture from a police photo array. [On October 6, 2004, the State charged Drake with murder.] On October 10, 2004, Drake, who had fled to California, contacted Carlos Kelly, a pastor in San Diego. Two days later, Kelly helped Drake turn himself in to the local law enforcement authorities.

*Drake v. State*, No. 18A02-0605-CR-367, slip op. at 2-3 (Ind. Ct. App. May 1, 2007) (footnote omitted), *trans. denied*.

[3]     A jury trial was held in February 2006. Drake was represented by two attorneys. Defense counsel's theory was that although Drake was present at the scene, Williams was the shooter. Tr. p. 649. The jury found Drake guilty of murder, and the trial court sentenced him to fifty-five years.

[4] Drake appealed raising numerous issues, including that the evidence was insufficient to prove that he was the shooter (rather, it was Williams). We disposed of this argument as follows:

> To sustain a conviction for murder, the State had to present evidence to establish that Drake knowingly killed Masiongale. I.C. § 35-42-1-1(1). At trial, four witnesses testified that Drake shot Masiongale—Scott, Williams, Adams, and Trahan. All four testified that Drake was the passenger in Williams's vehicle and that he shot Masiongale. Tr. p. 126-27, 205, 255, 382. For instance, Trahan testified that Williams, Masiongale, and Drake were "negotiating a price" for the television and that "all of a sudden [Drake] reached into his pocket like he was getting out some money. And then he pulled out a gun and shot [Masiongale]." *Id.* at 255. As a result of the gunshot wound, Masiongale was pronounced brain dead the next morning and died after being removed from life support.
>
> While Drake presents an alternative theory regarding the events preceding Masiongale's death, his argument is merely an invitation for us to reweigh the evidence—a practice in which an appellate court does not engage. Thus, we conclude that the State presented sufficient evidence to sustain Drake's murder conviction.

*Drake*, No. 18A02-0605-CR-367, slip op. at 5.

[5] Drake filed a pro se petition for post-conviction relief in 2008, which was amended by counsel in 2015 and 2017. Drake argued that his trial counsel were ineffective on several grounds. The post-conviction court denied relief.

[6] Drake now appeals.

# Discussion and Decision

[7] A defendant who files a petition for post-conviction relief has the burden of establishing the grounds for relief by a preponderance of the evidence. *Hollowell v. State*, 19 N.E.3d 263, 268-69 (Ind. 2014). If the post-conviction court denies relief, and the petitioner appeals, the petitioner must show that the evidence leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id.* at 269. We review the post-conviction court's legal conclusions de novo but accept its factual findings unless they are clearly erroneous. *Stevens v. State*, 770 N.E.2d 739, 746 (Ind. 2002), *reh'g denied*.

[8] Drake contends that the post-conviction court should have granted him relief on the basis that his trial attorneys rendered ineffective assistance. When evaluating such a claim, Indiana courts apply the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984): whether counsel performed deficiently and whether that deficient performance prejudiced the defendant. *Humphrey v. State*, 73 N.E.3d 677, 682 (Ind. 2017). An attorney's performance is deficient if it falls below an objective standard of reasonableness—if the attorney committed errors so serious that it cannot be said that the defendant had "counsel" as guaranteed by the Sixth Amendment. *Id.* A defendant has been prejudiced if there is a reasonable probability that the case would have turned out differently but for counsel's errors. *Id.* "We afford great deference to counsel's discretion to choose strategy and tactics, and strongly presume that counsel provided adequate assistance

and exercised reasonable professional judgment in all significant decisions." *McCary v. State,* 761 N.E.2d 389, 392 (Ind. 2002), *reh'g denied.*

# I. Williams

Drake's first argument that trial counsel were ineffective centers on the State's witness, Williams. Drake asserts that counsel did not adequately cross-examine and impeach Williams and failed to object to evidence that Williams failed a voice stress exam and purchased a gun from Drake.

The underlying facts are as follows. Williams first talked to police on October 5, 2004—three days after the shooting. Before speaking with police, Williams made an agreement with the State that if he testified truthfully against Drake and gave a truthful statement to police, no charges would be filed against him. Tr. p. 393. Williams, however, later failed a voice stress exam,[1] and in March 2005 the State charged Williams with murder (murder in the commission of a felony). *Id.* at 394-95. The night before Drake's February 2006 trial, the State made a second agreement with Williams that if he testified truthfully against Drake, the murder charge would be dismissed. *Id.* at 371, 396. Williams then testified at Drake's trial. Specifically, Williams testified that Drake called him

---

[1] The post-conviction court described the voice stress exam as follows:

> [A] police officer hooks a person up to a computer and orally asks the person a series of questions. These questions and answers are videotaped. There is a computer printout and the officer formulates an opinion as to whether the person answered the series of questions truthfully. The police officer writes a police report on what transpired.

Appellant's P-C App. Vol. IV p. 8 (Finding 49).

on October 2, 2004, and told him that "he knew who stole his tv and asked [Williams] if [he] would go with him to . . . get it." *Id.* at 375. Williams testified that when he went to Drake's house to pick him up, he saw Drake put a gun in his pants. Finally, Williams testified that after he drove to the arranged meeting place and started negotiating a price for the television, Drake exited the passenger side of the truck and shot Masiongale. Williams testified that the main difference between his October 5, 2004 statement to police and his trial testimony was that he did not tell police on October 5 that he saw Drake put a gun in his pants. *Id.* at 396, 399.

[11]     On cross-examination, defense counsel asked Williams about a voice stress exam that he had taken in early March 2005. *Id.* at 394. Defense counsel also asked Williams if he had "any guns" at his house at the time of the shooting. *Id.* at 401. Williams said yes and then listed them, including "a three eighty handgun." *Id.* Defense counsel then asked Williams if police found the handgun at his house, and Williams said no because he "got rid of it" in a dumpster. *Id.* On redirect, the State asked Williams, "Who did you buy that handgun off of," and Williams responded Drake. *Id.* at 403. Also on redirect, the State offered into evidence the results from the voice stress exam (Exhibit 19) that Williams had taken on March 1, 2005. *Id.* at 404. Exhibit 19 included the questions asked, Williams's responses, and the examiner's conclusion that Williams showed "deceptive responses on all relevant questions." Ex. 19. Defense counsel's "only objection" to Exhibit 19 was that the State did not

provide it to them in discovery. Tr. p. 404. The trial court admitted Exhibit 19 into evidence. *Id.*

## A. Cross-Examination of Williams

[12]     Drake first claims that trial counsel failed to adequately cross-examine and impeach Williams about the agreement he reached with the State the night before Drake's trial. Drake acknowledges that defense counsel cross-examined Williams about the last-minute agreement. *See* Appellant's Br. p. 19 ("[Counsel] did point out that Williams was charged with Murder and that those charges were to be dismissed . . . ."). Indeed, as we noted on direct appeal:

> Drake cross-examined Williams at trial and elicited Williams's potential biases. Specifically, Drake's cross-examination confirmed that Williams had been charged with Masiongale's murder in March 2005 and that he had been imprisoned until he "made a deal with the Prosecution" the night before Drake's trial. [Tr. pp.] 393-96.

*Drake*, No. 18A02-0605-CR-367, slip op. at 9. Drake, however, asserts that counsel should have gone about it in a different way, such as by introducing into evidence the actual charging information against Williams and the penalty range for the offense. But Drake doesn't make a convincing argument that his suggested approach would have been any more effective than the approach that counsel employed. Moreover, the jury was well aware that Williams had been charged with murder and that the charge was going to be dismissed because of

his testimony at Drake's trial. Drake has not met his burden of showing that counsel were deficient in their cross-examination of Williams.

## B. Voice Stress Exam

[13] Drake next claims that counsel were ineffective for failing to object to the admission of the results of Williams's voice stress exam, Exhibit 19, on the ground that the State had not previously disclosed those results to the defense. But counsel **did** object on that ground, as follows:

> [DEFENSE COUNSEL]: The only objection that I would have, Your Honor, is that is the first time we've ever seen that document. It wasn't provided in the State's discovery.
>
> [DEPUTY PROSECUTOR]: Judge, I would have to take a second and go through the discovery to ensure that that was provided.
>
> THE COURT: But aside from . . . .
>
> [DEFENSE COUNSEL]: Aside from that, no, I don't have any objection to it.
>
> THE COURT: Alright. Be admitted into evidence.

Tr. p. 404.

[14] While counsel could have been more forceful or persistent in their objection on this ground, the fact remains that counsel made the objection that Drake now claims they should have made. But even if counsel had handled the objection

in a different way, the State had, in fact, previously disclosed Exhibit 19 to the defense. The post-conviction court found as much, *see* Appellant's P-C App. Vol. IV p. 9 (Findings 51, 52, 58), and Drake does not challenge these findings on appeal.[2]

[15] Drake next argues that even if counsel were provided with Exhibit 19 during discovery, they were ineffective for failing to "think through the ramifications of stipulating to its admissibility" and then not objecting on that ground. Appellant's Br. pp. 28, 30. But the record demonstrates that counsel thought through the ramifications and made a strategic decision about the voice stress exam; it was counsel who first brought up the topic of the failed voice stress exam with Williams on cross-examination:

> Q      And then after that, uh, sometime in, uh, around . . . first of March of 2005, you **failed two (2) voice stress tests**, is that correct?
>
> A      Yes.
>
> Q      And those are all regarding the events of this evening, of that evening, is that correct?

---

[2] Drake argues that counsel should have specifically objected on the basis of *Brady v. Maryland*, 373 U.S. 83 (1963), which provides that the State has an affirmative duty to disclose material evidence favorable to the defendant. *State v. Hollin*, 970 N.E.2d 147, 153 (Ind. 2012). However, a *Brady* objection would have failed for the same reason we just stated—the State did turn over Exhibit 19 to the defense during discovery.

A      No. I failed questions if I was male or female, living in Indiana, my name is Jordan. I failed every question there was to the test, sir.

Q      Every single question they asked you, you failed?

A      Yes.

Q      Two (2) sets of tests?

A      Yes.

Q      One given by a Delaware County Police Officer?

A      Yes.

Q      And one given by a Private Investigator here in town?

A      Yes.

Q      And then on March 15th or so of 2005 . . .,you were charged with murder, is that correct?

A      Yes sir.

Tr. p. 394 (emphasis added).[3] It was then on redirect that the State offered Exhibit 19 into evidence. *Id.* at 403. It is apparent from the cross-examination

---

[3] There appears to have been some confusion at the post-conviction hearing about who asked these questions at trial—the deputy prosecutor or defense counsel. *See, e.g.*, P-C Tr. p. 123. However, the trial transcript reflects that defense counsel's cross-examination of Williams started at the bottom of page 390 and ended at

above that counsel used the fact that Williams had failed the voice stress exams to discredit him. *See* P-C Tr. pp. 66-67 (counsel testifying at post-conviction hearing that it was a strategy decision to let in evidence that Williams was deceptive during the voice stress exam because it was "important for the jury to hear"). Because Drake has not made any argument that this strategy decision was unreasonable, we cannot say that counsel were deficient.[4]

## C. Handgun Purchase

[16] Last, Drake claims that counsel were ineffective for failing to object to Williams's redirect testimony that he purchased a handgun from Drake. To prevail on a claim of ineffective assistance due to the failure to object, the defendant must show a reasonable probability that the objection would have been sustained if made. *Passwater v. State*, 989 N.E.2d 766, 772 (Ind. 2013). Drake argues that Williams's testimony violated Indiana Evidence Rules 404(b) and 403 because the "allegation that Drake sold a gun to Williams had no relevancy as to any matter that was at issue in t[he] trial other than his propensity to have committed the charged act" and thus was unduly prejudicial. Appellant's Br. p. 22. The State responds that Drake cannot show a reasonable probability that an objection would have been sustained because counsel

---

the top of page 403, which includes the above exchange on page 394. The State's redirect of Williams then started on page 403.

[4] Drake does not acknowledge the fact that his counsel were the first ones to bring up the topic of the failed voice stress exams, let alone argue that they were deficient for doing so.

opened the door to this line of questioning on cross-examination by asking Williams if he had any guns at his house at the time of the shooting.

[17] "Opening the door refers to the principle that where one party introduces evidence of a particular fact, the opposing party is entitled to introduce evidence in explanation or rebuttal thereof, even though the rebuttal evidence otherwise would have been inadmissible." *Sampson v. State*, 38 N.E.3d 985, 992 n.4 (Ind. 2015). Evidence that opens the door "must leave the trier of fact with a false or misleading impression of the facts related." *Cameron v. State*, 22 N.E.3d 588, 593 (Ind. Ct. App. 2014) (quotation omitted). When that happens, the State may introduce otherwise inadmissible evidence if it is "a fair response to evidence elicited by the defendant." *Id.* (quotation omitted). The State claims that counsel's cross-examination of Williams left the jury with the false impression that Williams was the only person with a connection to the handgun, which wasn't the case. Appellee's Br. p. 17. We agree and therefore find that counsel were not deficient for not objecting to Williams's redirect testimony that he purchased the handgun from Drake because there is not a reasonable probability that the objection would have been sustained.[5]

---

[5] Drake does not argue that counsel were ineffective for bringing up the topic of guns with Williams in the first instance.

# II. Scott's Identification of Drake

[18] Drake next argues that trial counsel were ineffective because they failed to challenge Scott's (the victim's girlfriend) identifications of Drake as the shooter. Scott identified Drake from a photo array before trial and then during trial. Drake argues that counsel should have filed "a pre-trial motion to suppress the photo array" because it was unduly suggestive and then objected "to [Scott's] in-court identification of Drake" because there was no "independent basis" for it. Appellant's Br. p. 17.

[19] Drake asserts that there was "no conceivable strategy reason" for counsel not to object to Scott's identifications of him because the issue at trial was who shot Masiongale. However, we can readily dispose of this claim on the prejudice prong alone. *See Baer v. State*, 942 N.E.2d 80, 91 (Ind. 2011) ("If we can easily dismiss an ineffective assistance claim based upon the prejudice prong, we may do so without addressing whether counsel's performance was deficient."), *reh'g denied*. As we said in our opinion on direct appeal, "At trial, four witnesses testified that Drake shot Masiongale—Scott, Williams, Adams, and Trahan.[6] All four testified that Drake was the passenger . . . and that he shot Masiongale. Tr. p. 126-27, 205[-07], 255, 382." *Drake*, No. 18A02-0605-CR-367, slip op. at 5. Notably, Drake does not challenge Adams's and Trahan's trial testimony on post-conviction. Because there are other eyewitnesses who identified Drake as

---

[6] Trahan could not identify Drake, but he testified that it was the passenger—not the driver—of the truck who shot Masiongale. Tr. pp. 272, 282-83.

the shooter, Drake has failed to prove that he was prejudiced by counsel's failure to challenge Scott's identifications of him.

## III. Detective Whitesell

[20] Drake's last argument that trial counsel were ineffective concerns the testimony of Yorktown Police Department Detective Jeffery Whitesell. Detective Whitesell testified at trial that he spoke with the mother of Jordan Quinn (who had called Drake to tell him that Masiongale had contacted him about a television) on October 3, 2004, and during that conversation, he "first" "heard Jermaine Drake's name." Tr. p. 565. Detective Whitesell testified that he then obtained a photo of Drake and put it into a photo lineup. Drake argues that counsel were ineffective for failing to object on grounds of hearsay because "Whitesell told the jury [that Quinn's mother] provided the first tip to him that Drake was the potential shooter" but Quinn's mother's "was not an eye witness to the events." Appellant's Br. p. 24.

[21] In response, the State first points out that Detective Whitesell did **not** testify that Quinn's mother told him that Drake was the shooter. The State then argues that Detective Whitesell's testimony "simply explained to the jury how or why the investigation proceeded as it did and how or why [Drake's] photograph was included." Appellee's Br. p. 18. This is known as course-of-investigation evidence.

[22] The Indiana Supreme Court explained the purpose and dangers of course-of-investigation testimony in *Blount v State*:

> Although course-of-investigation testimony may help prosecutors give the jury some context, it is often of little consequence to the ultimate determination of guilt or innocence. The core issue at trial is, of course, what the **defendant** did (or did not do), not why the **investigator** did (or did not do) something. Thus, course-of-investigation testimony is excluded from hearsay only for a limited purpose: to bridge gaps in the trial testimony that would otherwise substantially confuse or mislead the jury. The possibility the jury may wonder why police pursued a particular path does not, without more, make course-of-investigation testimony relevant. Indeed, such testimony is of little value absent a direct challenge to the legitimacy of the investigation. . . .

22 N.E.3d 559, 565 (Ind. 2014) (citations and quotations omitted).

[23] Here, because Drake makes no allegation of police impropriety in narrowing the investigation to him, the reason the police included Drake in the photo array was not at issue. *See id.* at 567 ("Blount made no allegation of police impropriety in narrowing their investigation to him; thus, the **reason** the police included Blount in the photo array was simply not at issue."). Therefore, because Detective Whitesell's testimony that Quinn's mother gave him Drake's name was likely inadmissible course-of-investigation evidence, counsel should have objected.

[24] But an ineffective-assistance claim also requires a showing of prejudice. Drake claims he was prejudiced by counsel's failure to object because it was yet "another person" who "identif[ied] [him] as the shooter." Appellant's Br. p. 25. But as noted above, Detective Whitesell did not testify that Quinn's mother told him Drake was the shooter. And Drake makes no claim that the

investigation would not have turned to him eventually. Accordingly, Drake was not prejudiced by counsel's failure to object to Detective Whitesell's testimony that he first learned Drake's name from Quinn's mother.

[25] Affirmed.

Pyle, J., and Barnes, Sr. J., concur.